Submitted May 23, reversed and remanded July 27, 2022

In the Matter of A. G. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

A. G. B.,
*Respondent,*

*v.*

L. M. B.,
*Appellant.*

Multnomah County Circuit Court
20JU04758;
Petition Number 12020121;
A177110

515 P3d 927

Mother appeals a judgment terminating her parental rights to her daughter, A. A was removed from mother's care when she was around 10 months old and has since been with the same foster care parents. On appeal, mother does not challenge the juvenile court's determination that, under ORS 419B.504, grounds for terminating her parental rights are present. Rather, mother challenges only the determination under ORS 419B.500 that termination is in A's best interest. *Held*: On *de novo* review under the applicable clear-and-convincing-evidence standard of proof, the Court of Appeals majority was not persuaded that it was highly probable that termination of A's legal relationship with her mother is in A's best interest.

Reversed and remanded.

Amy Holmes Hehn, Judge.

G. Aron Perez-Selsky filed the brief for appellant.

Ginger Fitch and Youth, Rights & Justice filed the brief for respondent A. G. B.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent Dept. of Human Services.

Before Powers, Presiding Judge, and Lagesen, Chief Judge, and Hellman, Judge.

LAGESEN, C. J.

Reversed and remanded.

Powers, P. J., dissenting.

**LAGESEN, C. J.**

Mother appeals a judgment terminating her parental rights to her daughter A; A is now three years old but was not quite three at the time of the termination trial. A was removed from mother's care when she was around 10 months old and has been with the same foster care parents since. On appeal, mother does not challenge the juvenile court's determination that, under ORS 419B.504, grounds for terminating her parental rights are present. Rather, mother challenges only the determination under ORS 419B.500 that termination is in A's best interest. For the reasons that follow, a majority of the three of us is not persuaded by the evidence in this record that it is in A's best interest to terminate mother's parental rights. We therefore reverse and remand.

Our review is *de novo*. ORS 419A.200(6); ORS 19.415(3). "That standard requires us to examine the record with fresh eyes to determine whether the evidence developed below persuades us that termination is in [A's] best interest." *Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750, 432 P3d 1186 (2018), *rev den*, 365 Or 556 (2019). Because the standard of proof is clear-and-convincing evidence, we must be persuaded that it is "highly probable" that severing the legal relationship between A and her mother is in A's best interest. *Id.* As we have explained, "our role in resolving the question of [a child's] best interest is, for the most part, identical to that of the juvenile court." *Id.* (internal footnote omitted). Put another way, when we review *de novo*, we are not performing our more typical appellate-court function of assessing whether the evidence before a trial court was legally sufficient to support its ruling. Rather, we are deciding for ourselves whether the case made by the party with the burden of persuasion persuades us that that party has proven its case.

Whether terminating the legal relationship between a parent and a child is in the child's best interest requires a fact-specific, child-centered inquiry into how termination likely will affect the particular child: "[T]he juvenile code demands a persuasive factual showing that termination of parental rights to a particular child is in that child's best

interest, in view of the particular needs and circumstances of the child." *Id.* at 753. Significantly, the Supreme Court has explained that even when a parent is unfit to parent a child, making reunification unlikely or impossible, there is no presumption that, because of the parent's unfitness, it is in the child's best interest that the parent's rights be terminated. *Dept. of Human Services v. T. M. D.*, 365 Or 143, 161-63, 442 P3d 1000 (2019). Rather, whether termination is in a child's best interest must be determined on a case-by-case basis. *Id.*

Case law identifies several considerations that inform whether terminating a child's legal relationship with a parent is in the child's best interest. Those include (1) the strength of the bond between the parent and child; (2) whether severing that bond will help or harm the child; (3) the benefits to the child of terminating parental rights; and (4) the risk of harm to the child posed by termination. *See id.* at 163-66 (examining child's bond with mother and mother's family, the benefits of maintaining that bond, and whether stable caregiving relationship would be available in absence of termination to assess whether termination was in child's best interest); *see also T. L. M. H.*, 294 Or App at 751-52 (concluding that record was inadequate to permit meaningful evaluation of whether termination was in child's best interest, where child was attached to parent and the Department of Human Services (DHS) failed to develop "evidence that would permit a meaningful evaluation of whether and how [the child's] attachments can be preserved in a manner consistent with his permanency needs"). Ultimately, to be able to conclude that termination is in a child's best interest, we must be able to determine with confidence that the benefits to the child of ending the child's legal relationship with a parent outweigh the risk of harm posed to the child by severing that legal relationship.

In our view, the evidence developed by DHS in support of its case that termination is in A's best interest does not allow for the fulsome inquiry needed to determine whether the benefits of permanently ending A's legal relationship with mother outweigh any risks to her posed by termination. The evidence is persuasive that it is in A's best

interest to remain long-term with her current caregivers, with whom she is thriving, and to whom she has formed an attachment, the severing of which could be detrimental to A. But the evidence shows that A has a bond with mother and calls her "mama"; and has different names for her caregivers.[1] Moreover, A's caregivers are willing to maintain A's relationships with her biological family, provided boundaries are in place. Under those circumstances, to be convinced that it is highly probable that termination is in A's best interest, we would need to know more about the likely effects of termination on A. Although DHS presented evidence that a benefit to A of termination would be that her current caregivers could adopt her, DHS did not develop evidence that allows for a meaningful evaluation of the risks, if any, posed to A of severing her legal ties to mother, or whether the benefits of severance outweigh any such risks. We find the following evidentiary deficits noteworthy in that regard:

- Although Dr. Bennett conducted a "best interest" examination of A, she did not observe A and mother together, and she did not address whether and to what extent preserving a bond with mother would be beneficial or harmful to A, in the event A was not returned to mother's care.

- There is no evidence that termination of mother's parental rights is required to preserve A's placement with her current caregivers, or even whether those caregivers, who know A and her relationship with mother well, perceive severing A's ties with her mother to be in A's best interest. Rather, the

---

[1] Our dissenting colleague finds persuasive statements by A's caregivers to Dr. Bennett, which Bennett included in the "best interest" report, that they did not observe "an obvious bond" between A and mother when A saw mother for the first time after she was removed from her care. We do not find that evidence particularly persuasive on the question of A's attachment to mother. It is hearsay for one. Although there is no dispute that it was properly admitted, we decline to place great weight on it for that reason. Moreover, it is not entirely consistent with the testimony at trial. A's foster mother testified:

"So the first time [A] saw her mom after she was removed was at court so it wasn't a visit exactly. She didn't cry when she saw her mom but she did go willingly into her mom's arms and that was after a weekend in our care, so when we were all together at court she would reach for like both her mother and for us to meet her needs."

evidence is that DHS did not inquire whether A's caregivers were amenable to being her caregivers if A's legal ties to mother remained intact. DHS caseworker Wooten testified that she had "not had that discussion [about guardianship] thoroughly enough." That appears to be because of a standard practice of not considering whether guardianships might be appropriate for children of A's age.

• There is no evidence addressing whether severance of the legal relationship might be necessary to ensure that mother does not undermine the efforts of A's caregivers to give her the stable, permanent environment that she needs.

Given those evidentiary deficits, we are not persuaded that it is highly probable that termination of A's legal relationship with her mother is in A's best interest. In our view, the record simply is not complete enough for us to make the call that it is "highly probable" that the benefits to A of severing her legal ties with mother outweigh the risks to her posed by severance. Accordingly, we reverse and remand.

Reversed and remanded.

**POWERS, J.,** dissenting.

On *de novo* review, I would conclude that termination of mother's parental rights is in A's best interests given her particular situation and needs. As an initial matter, I agree with the majority opinion that it is in A's best interest to remain long-term with her current caregivers, that A is thriving, and that A has formed an attachment to those caregivers and severing that attachment could be detrimental to her. 321 Or App at 53-54. Further, although I agree that there could be more evidence about the likely effects that termination of mother's legal relationship would have on A, I would nevertheless conclude that, on *de novo* review, it is in A's best interest to be freed for adoption. Accordingly, I respectfully dissent.

First, the majority opinion appears to place undue weight on mother's relationship with A and relies too heavily

on the names A uses for the adults in her life. *See* 321 Or App at 54 (concluding that "the evidence shows that A has a bond with mother and calls her 'mama'; and has different names for her caregivers"). As an initial matter, although A refers to mother as "mama" or "mom," A also uses similar terms—albeit in a different language—for her resource parents: A uses "Ima" and "Tate," which was described as "mom in Hebrew" and "dad in Yiddish." Unlike the majority opinion, I would not place much weight on the nomenclature used by A, who was removed from her mother's care when she was around 10 months old and has been placed with the same resource parents since that time.

More substantively, although a DHS caseworker testified that A had a "form of attachment" to mother, the other evidence in the record demonstrates that their relationship falls short of a bond as that term is commonly used. For example, the "best interest" evaluation submitted by Dr. Bennett, a child psychologist, describes A having "no obvious reaction" after the first weekend of being separated from her mother. Bennett explained that A "didn't reach for [mother] and she didn't cry for [mother]" when the caregivers and A left the visit.[2] Further, mother's testimony at the termination trial appeared to acknowledge that she did not have a strong relationship with A: "My current plan? My current plan is to get my child back with me but yet—I mean, so I can bond with her again[.]" Moreover, testimony by a DHS caseworker explicitly avoided using the term "bond" to describe mother's relationship with A.[3] In short, unlike the majority opinion, I would reject mother's assertion on appeal

---

[2] The majority opinion correctly notes that Bennett's report includes hearsay; however, it is unobjected to hearsay and, therefore, considered substantive evidence. *See, e.g.*, *State v. Harris*, 288 Or 703, 722, 609 P2d 798 (1980) (explaining that "when hearsay evidence is introduced without objection it is entitled to consideration as 'competent' and substantive evidence"). Moreover, A's resource (or foster) mother testified about A's interactions with mother during the community visits:

  "Q: When you arrived at the visits would [A] run to her mother?

  "A: No.

  "Q: Would she cry upon seeing her mother?

  "A: No."

[3] At the termination trial, Wooten, the DHS caseworker who had been working with mother and A since February 2019 explained:

that she and A "were attached, and had a close and loving relationship"; instead, I would agree with child's argument on appeal that the "facts are less effusive."

Second, the majority opinion discounts Bennett's testimony and "best interest" evaluation because she did not observe mother together with A and because her conclusions did not address "whether and to what extent preserving a bond with mother would be beneficial or harmful to A, in the event A was not returned to mother's care." *See* 321 Or App at 54. Although a more developed record may have included this information, the evidence that was adduced demonstrates, in my view, why termination is in A's best interest. In her report, Bennett explained:

> "It is important to consider the impact of returning a child to a chaotic or unpredictable home environment after having already experienced relationship losses from moving homes or having variable contact, as there can be a compounded effect of verifying a child's negative assumptions about the trustworthiness and reliability of adults who are in roles of caregiving. Putting [A] in a situation where she is again exposed to a chaotic home environment, drug use, and parental instability also puts her at risk of another placement disruption—which again adds to an accumulation of emotional stress and relationship confusion that can impact her developing relational models."

Bennett further concluded in her report that A "has spent over a year in this home, during a critical period of attachment, and has developed close relationships with these caregivers. Placing her in yet a different home puts her at risk of suffering relational loss and trauma that could impact her developing attachment models." (Emphasis omitted.) At the termination hearing, after noting A's history, including "back and forth contact with—with her biological mother

---

"Q [by mother's counsel]: *** When you were rooting for [mother] to be successful that was because you saw that [mother] had a bond with her child; is that correct?

"A [by Wooten]:  That's not correct. I wouldn't use that language.

"Q:  Okay. You were rooting for her but you didn't think she had a bond with her child?

"A:  Neither/or. I was rooting for her because I wanted to see her successfully be able to parent her child free of substances."

[that] can also be a bit confusing with attachment development," Bennett further elaborated on why an inconsistent contact with mother would be concerning. She explained, "especially at this age it changes the dynamic of how primary that relationship is in terms of [A's] conceptualization of who the primary caregivers are and who takes care of her, so people who step in and out of" a young child's life "might continue to be familiar and still have a positive relationship but it's not the same as a parenting relationship that's consistent with daily care." In my view, although this evidence is somewhat generic, it nevertheless addresses A's present circumstances and raises valid concerns about her development, which certainly is a factor in weighing what is or is not in her best interest.

Third, although the majority opinion correctly identifies in its list of evidentiary deficits that there is "no evidence addressing whether severance of the legal relationship might be necessary to ensure that mother does not undermine the efforts of A's caregivers to give her the stable, permanent environment that [A] needs," the absence of that evidence should not, in my view, weigh heavily. *See* 321 Or App at 54. Evidence that a parent may seek to undermine efforts by a child's caregiver certainly may be an affirmative reason why termination is in a child's best interest, but it is not a necessary condition to showing why termination is in a child's best interest. *See, e.g.*, *Dept. of Human Services v. J. S. E. S.*, 315 Or App 242, 244-45, 501 P3d 556 (2021), *rev den*, 369 Or 209 (2022) (reiterating that the best interest determination is "focused on the needs of the child" and concluding that keeping open an option of a permanent guardianship was not in the child's best interest given the parent's current capacity).

Our cases discussing best interests repeatedly have observed that we will not assume that severing a child's legal relationship with a parent deemed to be legally unfit is in a child's best interest without evidence. *See id.* at 244-45 (recognizing that "[t]he fact that a parent is unfit does not necessarily establish that termination of [the parent's] parental rights is in the child's best interest"). Similarly, and just as important, we also repeatedly have recognized

that a child's needs for permanency and stability are paramount. *Dept. of Human Services v. F. L. B.*, 255 Or App 709, 733-34, 298 P3d 626, *rev den*, 354 Or 61 (2013) ("As we have recognized time and time again, at some point, the child's needs for permanency and stability in life must prevail." (Internal quotation marks omitted.)). A's brief in support of affirmance persuasively summarizes the situation: "[A] is loved by her mother who suffers under the impact of almost three decades of methamphetamine use along with concurrent, untreated mental health issues. Two years before this termination trial, when her mother had five months of sobriety, her mother's prognosis was still poor." Here, the evidence demonstrates that A has a secure attachment with her resource parents. The relative weakness of the relationship between mother and A together with the other evidence in the record leads me to conclude on *de novo* review that terminating mother's parental rights is in A's best interest.

Accordingly, I respectfully dissent.