Argued and submitted August 16, affirmed October 26, petition for review denied December 29, 2022 (370 Or 694)

In the Matter of S. L. A. H.,
aka S. H., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

N. H.,
*Appellant.*

Multnomah County Circuit Court
19JU07460;
Petition Number T2019178;
A178130

520 P3d 424

Mother appeals from a judgment terminating her parental rights to her daughter. Mother argues that the juvenile court erred in concluding that (1) mother was unfit to parent, (2) the child's reintegration into mother's home was improbable within a reasonable time, and (3) termination of mother's parental rights was in the child's best interest. *Held*: On *de novo* review, the Court of Appeals concluded that the evidence was clear and convincing that, at the time of the termination trial, mother was unfit to parent because her conduct had seriously detrimental effects on the child and the child's integration into mother's home was improbable within a reasonable time. The court further concluded that termination of mother's parental rights was in the child's best interest.

Affirmed.

Patrick W. Henry, Judge.

Kristen G. Williams argued the cause and filed the briefs for appellant.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Lagesen, Chief Judge, and Joyce, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Mother appeals from a judgment terminating her parental rights to her daughter, S. Mother argues that the juvenile court erred in concluding that (1) mother was unfit to parent, (2) the child's reintegration into mother's home was improbable within a reasonable time, and (3) termination of mother's parental rights was in the child's best interest.[1] On *de novo* review, ORS 419A.200(6); ORS 19.415(3)(a), we affirm.

## I.   FACTS

A.  *Events Leading to Child's Removal and Dependency Jurisdiction*

S was born in March 2018. She was transferred to the newborn intensive care unit (NICU) shortly after her birth because she needed a feeding tube. A few days later, the hospital notified DHS of concerns about mother's "cognitive disabilities." A DHS caseworker then began assessing whether mother could appropriately care for S. Due to S's age and medical needs, DHS's goal was to craft an in-home plan for mother with a safety service provider who could supervise and monitor child's safety "24/7."

During this time, mother became agitated that S was being kept in the hospital. She stated that she planned to bring S home, although hospital staff told her that S still needed her feeding tube and was not ready to go home. At one point, mother told hospital staff, "I don't care what anyone says, I'm coming up there to take my baby home and you can't stop me."

Because there were not enough safety services in place to ensure an in-home plan, and because mother was unable to follow directions from hospital staff and nurses regarding S's medical needs, about 10 days after S's birth,

---

[1] Mother assigns error to the sufficiency of the evidence in proving that mother neglected S under ORS 419B.506. We reject that argument without further discussion because although the juvenile court included reference to the allegation of neglect, the court's written judgment relies solely on the ground of mother's unfitness under ORS 419B.504.

DHS filed a petition in juvenile court to have the court take jurisdiction over S. In April 2018, the court found S within its jurisdiction based on mother's admissions that she has an anger control problem that interferes with her ability to safely parent the child and because the child has no legal father. Later, DHS filed an amended petition for dependency jurisdiction and the court found additional jurisdictional bases based on mother's admissions that she has "limited cognitive abilities" and the "child has specialized medical needs [m]other is unable or unwilling to provide for, interfering with her ability to safely parent."

After S was discharged from the hospital, DHS placed S in a nonrelative foster home.

### B.  *DHS Involvement and Mother's Performance in Services*

Mother participated in a neuropsychological and psychological evaluation with Dr. Poppleton in October 2018. Poppleton diagnosed mother with a provisional moderate intellectual disability, other specified trauma and stressor-related disorder, and neglect of a child. He noted that mother's assessment results indicated that mother had "significant cognitive and neuropsychological impairment across all domains assessed, including verbal abilities, immediate and delayed memory, visual-spatial skills, and attention." Her "non-verbal, problem-solving skills [were] also significantly compromised." Poppleton concluded that mother's "parenting weaknesses are related to that of her cognitive capacity[,]" and recommended that mother have a good support system, "such as a daily check-in support person. Monitoring should be frequent, consistent, and long-term." Poppleton considered it positive that mother "has been agreeable with her social workers" and that she was "assertive, desires independence, and actively seeks support." Poppleton also noted that mother "appear[ed] to have good coping skills in place to help manage her anger[,]" and "is proactive in seeking independence and support[.]" He was "impressed with [mother's] level of insight given her cognitive limitations."

Over the first year of S's life, mother's permanency worker, Aviv, worked to find an adult foster home that could

facilitate an in-home plan for both mother and child, but she was unable to find a suitable one.[2] Meanwhile, to help mother address her parenting skills, Aviv referred her to a program specifically designed for parents with intellectual disabilities at Family Skill Builders. Mother engaged in the one-on-one hands-on parent training, which is designed to teach mother how to safely care for S. Family Skill Builders recommended three rounds of classes; mother declined to attend the third round, stating that "she didn't have anything else to learn." After mother declined continuing the class, Aviv observed that her parenting skills regressed. During a community visit, mother dropped S and S was injured. As a result, DHS reduced community visits and then moved mother's visits back to the DHS office for social service assistant (SSA) supervision.

Mother's visits were sporadic. She missed her visits so frequently that DHS suspended her visits several times. When mother did attend visits, DHS personnel had to stay in the same room with mother and S for safety reasons. The SSA observed that mother was not able to understand S's needs and was not receptive to feedback. For example, during one visit, S almost fell over onto the floor twice because mother did not support S in sitting up, although the SSA had repeatedly reminded mother to do so. To further help mother understand S's needs—which, as we describe below, are extensive—DHS invited S's foster parent to each family decision meeting to explain to mother all of S's current medical diagnosis and needs in therapy. Aviv also invited mother to the child's medical appointments and expanded visitations for all of S's early intervention appointments, but mother failed to attend most of those.

Additionally, based on Poppleton's evaluation, DHS referred mother to a licensed professional counselor, Enticknap, who was experienced working with people with developmental disabilities. Enticknap worked with mother from May 2019 through July 2021. At trial, Enticknap testified that mother made progress on anger management,

---

[2] Aviv personally called every adult foster home in Oregon—185 homes—to see if they would be willing to allow mother to stay there with S, but they all declined. Mother proposed some of her friends and neighbors as safety service providers, but those persons were not suitable.

communication with her own mother and advocating for herself, and she had secured an apartment. But Enticknap noted that mother's engagement in therapy was inconsistent, and she was concerned about mother's independent functioning and decision making.

In July 2021, mother put S in a "time out" that S did not understand. S then refused to attend the next visit. As a result, DHS referred mother to Family Skill Builders again for therapeutic visits. Mother attended all visits and demonstrated "some understanding of attachment" and "showed affection through words and touch." However, mother did not demonstrate an adequate understanding of S's special needs and limitations. The service provider noted that mother appeared to expect "unrealistic language or attention abilities" from S.

On the advice of a disability advocate, mother began seeing a different therapist, Johns, in August 2021. Johns specializes in trauma and in attachment relationships, parenting, behavioral issues, and brain differences. She provided individual therapy to mother and child-parent psychotherapy services for mother and S. Mother regularly attended her twice weekly sessions with Johns. Johns observed that mother consistently made progress with frustration tolerance, emotional regulations, and self-care, and Johns believed that mother demonstrated ability with problem-solving. In observing mother's interactions with S, Johns described that mother made progress in reading S's facial expressions and body language and that she was "attentive, responsive, gentle" with S. Johns testified that, although mother and S were not really connecting in the beginning, the attachment improved over time. However, by the time of the termination trial, Johns noted that they had not yet begun to work on improving mother's ability to safely parent S and she could not predict when they would begin to address that.

In addition to the services that DHS provided to mother, she has also received ongoing developmental disability support since at least 2015. Mother's assessed needs included keeping her safe and healthy, hygiene support, accessing medical care, transportation, communication,

housekeeping, and support accessing in the community and employment. Mother is not required to use any of the services for which she qualifies. Rather, the services were provided at her requests. Mother frequently chose to not access services. Specifically, mother declined to work with a behavioral support specialist who analyzes what triggers certain behaviors and helps a client prevent escalating behavior. Mother also chose to not access services from a representative payee who could help her manage her money and declined supportive living, such as a group home or adult foster home, even at a time when she was homeless.

## C.  *S's Circumstances*

At the time of the termination trial in January 2022, S was four years old. She has global developmental delays and may need lifelong assistance due to a potential unknown genetic disorder that is being monitored. She exhibits challenging behaviors that demand individual attention and can be difficult to manage. As an infant, S needed physical therapy to help strengthen her muscles to sit up, crawl, walk, and to overcome sensory challenges and issues with self-regulation. She was difficult to soothe, demonstrated frustration by screaming, and threw tantrums where she hit her head against the wall. She wore a compression vest to help calm her down when she was overwhelmed and used wrist weights to draw. S also attended weekly speech therapy because she had "moderately delayed receptive language skills and significantly delayed expressive language skills."

By the time of trial, S's speech was improving, although she remained difficult to understand and would become frustrated when others did not understand her. In addition to therapy, S also had appointments with her regular pediatrician, developmental pediatrician, eye doctor, and geneticist. S qualified for developmentally disabled services.

In October 2020, S participated in a "best interest" evaluation with Dr. Bennett. Bennett observed that S was healthfully attached to her foster mother, with whom she has been with most of her life and who wants to adopt her. Due to S's communication delays, Bennett noted that S had a heightened need for a strong attachment. Any disruptions

in her bond with her primary caregiver will lead to her developing long-term trust issues and likely make her "more withdrawn, more avoidant, more anxious." In addition, she opined that, given S's significant special needs, S needed a consistent home environment with a reliable caregiver who would respond to her consistently, keep appointments, and be a strong advocate for her in the school to make sure that she gets the services that she needs.

D.   *Mother's Circumstances at the Time of Trial*

At the time of the trial, mother had just started a new job. She had changed five jobs in the previous month. Mother testified that she did not need a job coach because the coach just helped her communicate with her employer and she believed that she should be able to do it herself. As for living conditions, mother was living in a one-bedroom apartment. She failed to pay her rent in the month before trial and sought assistance to help her with the apartment power bill.[3] Although mother acknowledged that budgeting was a challenge for her, she insisted on doing it herself because she valued her independence.

E.   *Termination of Parental Rights Trial*

The juvenile court held the termination of parental rights trial in January 2022, approximately four years after S's birth. The juvenile court found that DHS had demonstrated by clear and convincing evidence that mother was unfit by reason of mother's conduct or condition that is seriously detrimental to the child and that the child's integration into her home within a reasonable time was improbable. ORS 419B.504. The court then determined that on the evidence presented, freeing S for adoption was in her best interest. ORS 419B.500.

Mother now appeals, challenging each of the juvenile court's conclusions.

## II.   ANALYSIS

To terminate a parent's rights on the basis of unfitness, a court must find, by clear and convincing evidence, that (1) the parent is "unfit by reason of conduct or condition

---

[3] Mother had been evicted twice for failure to pay rent.

seriously detrimental to the child or ward"; (2) "integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change"; and (3) termination is in the child's best interest. ORS 419B.504; ORS 419B.500. "Evidence is clear and convincing if it makes the existence of a fact highly probable or if it is of extraordinary persuasiveness." *State ex rel Dept. of Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007) (internal quotation marks omitted).

A.   *Mother's Unfitness*

A parent's fitness is measured at the time of the termination trial. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 83, 106 P3d 627 (2005). Whether a parent's conduct or condition has had a seriously detrimental effect on the child is meant to be "child-specific" and calls for "testimony in psychological and developmental terms regarding the particular child's requirements." *State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 657, 126 P3d 710 (2006). For example, "minimally adequate parenting skills may be different for a severely disabled child from those for a child that has no disabilities." *State ex rel SOSCF v. Wilcox*, 162 Or App 567, 576, 986 P2d 1172 (1999).

Additionally, and as particularly relevant here, a parent's rights cannot be terminated solely because a parent has a disability. Rather, ORS 419B.504(1)(f) permits a court to consider a parent's "mental health condition" only if that condition is "of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time." ORS 419B.504(2) further provides:

> "The court may not consider a parent's disability, as that term is defined in the Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.), unless the parent's *conduct* related to the disability is of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time."

(Emphasis added.)[4]

---

[4] The Americans with Disabilities Act defines "disability" to include a "mental impairment that substantially limits one or more major life activities of [the] individual." 42 USC § 12102(1)(A). A "mental impairment" may include "[a]ny

Those statutes work in tandem to limit how (and whether) a court can consider a mental health condition when that mental health condition qualifies as a disability under the Americans with Disabilities Act (ADA): A court cannot consider a parent's disability alone as a basis to terminate parental rights, but it may consider evidence of a parent's *conduct* if that conduct interferes with the parent's ability to provide proper care for the child for extended periods of time. That holds true even when that conduct is based on or caused by a disability.[5]

In light of that framework, we must determine whether mother's intellectual disability and trauma disorder, as reflected in her conduct, is of such nature and duration as to render her incapable of providing for S. On *de novo* review, we are persuaded that the evidence is clear and convincing that, despite some recent progress, mother is presently unfit to parent S.

The evidence at trial demonstrated that mother has made some of the progress that would be necessary to safely parent. Mother's second therapist, Johns, noted that mother demonstrated improvement with frustration tolerance, emotional regulation, and self-care. Johns also stated that although S was worried and not really connecting with

---

mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability." 28 CFR § 35.108(b)(1)(ii). "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." 42 USC § 12102(4)(C).

    [5] We note that ORS 419B.504(2)'s legislative history confirms our reading of the statute. Section 2 was added to ORS 419B.504 in 2018. Senate Bill (SB) 1528 was introduced due to concerns that the statute, as previously written, placed the burden on a parent to prove that any disability they possessed did not make them unfit to parent. Disability Rights Oregon (DRO) worked with legislators on the bill with the intent of ensuring that DHS is required to prove that the parent's disability renders the parent "incapable of providing proper care for the child or ward for extended periods of time." Audio Recording, Senate Committee on Human Services, SB 1526, Feb 6, 2018, at 13:00 (statement of Bob Joondeph, DRO Executive Director), https://olis.oregonlegislature.gov (accessed Oct 19, 2022). The bill's sponsors emphasized the need for the state to show that a parent's conduct is sufficiently detrimental to their children before removing children—let alone terminating parental rights—regardless of disability. Audio Recording, House Committee on Human Services and Housing, SB 1526, Feb 20, 2018, at 02:34‑08:40 (statements of Sen Sara Gelser and Sen Tim Knopp), https://olis.oregonlegislature.gov (accessed Oct 19, 2022).

mother in the beginning, mother remained attentive and the attachment started to improve over time.

However, despite mother's recent progress, there is clear and convincing evidence that at the time of the trial, mother struggles to internalize lessons she has been provided in developing her parenting skills, lacks insights into S's extensive ongoing needs, fails to respond to S appropriately, and is unable to provide for her own basic needs or a safe and stable home for S. As noted above, S is a child who suffers from severe developmental delays "in every area." The consensus among S's "best interest" evaluator, therapist, caregivers, and caseworker was that S needs a highly skilled caregiver who understands the child's needs, is able to implement the strategies that the therapist is working on with S, and who will care for her in the long term. Considering S's significant developmental delays, a caregiver without the necessary skills will be detrimental to S's progress and skill development.

Yet those are the needs that mother failed to demonstrate that she can meet at the time of the trial. Despite years of parenting assistance and classes, mother has been unable to absorb necessary parenting information and gain insights into S's special needs. For example, mother insisted that S was ready to be potty trained. However, the testimonies from caseworkers and S's foster mother clearly demonstrated that S was not ready; in fact, when the foster mother tried to engage in potty training with S, S would "freak out, scream, say no, hide." Similarly, during the trial, although mother was aware of S's developmental delays, she nevertheless testified that if S were returned to her care, she would put S in "day care" while she was at work. Mother's testimony reflected that she fails to understand that due to S's developmental delays and needs for therapy, the child cannot attend day care at this point.

In addition, mother injured S by dropping her on her head and in another instance, she put S in a "time out" that S did not understand, which resulted in S "absolutely refus[ing] to get into the car" at the next visit. S has significant communication delays, which make her more "vulnerable as a young child" due to her inability to communicate

a problem, a threat, or a feeling. Her caregiver's ability to recognize S's needs and nonverbal cues is critical to ensure S's safety and health. Yet mother's ongoing cognition limitations, reflected in her inability to gain insights into the child's developmental level and ongoing need for therapy, are detrimental to S's development and future progress.

Mother also fails to provide a viable plan for caring for S through outside support and exhibits unwillingness to accept the developmental disability services that are available to her. Because of her intellectual disability, mother requires social support to maintain her basic needs, but she frequently chooses not to access the support available to her, believing that she does not need services such as budgeting, behavior support specialist, or job coaching. Despite an abundance of evidence to the contrary, mother testified that she would be able to independently parent S and said that that was because S "[is] a toddler[.] [I]t's a lot more easier to * * * parent her." As mother put it at trial, she knew that support is available, and she can ask for help, "but I choose not to." Mother further testified that she had not talked to her support network, including her mother, personal services worker, a disability rights advocate, and her individual therapist, about their coming to support her to parent S because she was leaving it until she had custody. For the people mother identified, mother acknowledged that none of them would be available to help her with necessary daily parenting needs. In all, mother continued to fail to understand the limits on her ability to function independently and to meet S's ongoing needs.

Mother argues that in finding her unfit, the trial court and DHS "impermissibly focused on mother's intellectual disability and Poppleton's 2018 evaluation as the basis." We disagree. As described above, the trial court may consider evidence of mother's conduct related to the disability if that conduct is "of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time." ORS 419B.504(1)(f); *see also State ex rel SOSCF v. Mellor*, 181 Or App 468, 477, 47 P3d 19 (2002), *rev den*, 335 Or 217 (2003) (diagnosis is not enough; "there must also be evidence that the illness or

disorder renders the parent incapable of providing proper care for the child for extended periods of time" (internal quotation marks omitted)).

Here, the evidence shows that mother's mental illness renders her incapable of providing proper care. At trial, Poppleton testified that mother's disability and mental conditions negatively affected her abilities to use logic and judgment to problem-solve, and to respond to things in a rational manner. Those skills, as Poppleton noted, "are especially crucial for parenting young children." He explained that there was a gap between mother's abilities and S's high needs and that the way to bridge the gap was "either through internal change of the individual, or it comes through some form of support in their lives to be able to compensate for the inability to make those changes." However, as just described, the record shows that mother failed to overcome the parenting impediments that Poppleton identified, despite all the services provided to her over the years. Framed slightly differently, mother's conduct—reflected in mother's testimony at trial and her performance during visits and parenting classes—continues to be seriously detrimental to S, and thus establishes her parental unfitness.

B.  *Integration of Child into Mother's Home within a Reasonable Time*

When the parent is unfit, the court must consider whether it is improbable that the child can be reintegrated into the parent's home within a reasonable time. *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). ORS 419A.004(26) defines "reasonable time" as "a period of time that is reasonable given a child['s] *** emotional and developmental needs and ability to form and maintain lasting attachments."

Here, we are persuaded that it is improbable to integrate S into mother's home within a reasonable time. Despite years of parenting assistance and classes, mother still fails to respond appropriately to S's cues, lacks any understanding of her needs, and remains incapable of safely caring for her without assistance. Given that almost four years have passed since S's removal, it is unlikely that those conditions and conduct will change such that S could

be integrated into mother's care within a reasonable time. *See Dept. of Human Services v. C. P.*, 285 Or App 371, 381, 396 P3d 278, *rev den*, 362 Or 94 (2017) ("Given the long-standing and intractable nature of father's personality disorder and the high probability that father will not be able to safely parent the children, it is improbable that the children can be integrated into father's care within a reasonable time.").

To be sure, Johns, who had been working with mother for about six months at the time of trial, provided positive feedback on mother's progress in improving her parenting skills. However, as Johns acknowledged, she had not yet begun to work with mother on the recommendations that Bennett made about how to safely care for S and she could not predict when they would begin to address them. At the time of the trial, mother was still working on the initial steps to build an attachment with S.

Under those circumstances, we conclude that DHS provided clear and convincing evidence that S's integration into mother's home is improbable within a reasonable time. *See Dept. of Human Services v. R. K.*, 271 Or App 83, 93, 351 P3d 68, *rev den*, 357 Or 640 (2015) (parent's recent progress in treatment and commitment to change does not overcome other evidence of unfitness and, considering all the circumstances, it was improbable the child could be returned to the parent's care within a reasonable time).

C. *Best Interests of the Child*

We further conclude that termination of mother's parental rights is in the child's best interest. ORS 419B.500 provides that "[t]he parental rights of the parents of a ward may be terminated * * * only * * * if the court finds it is in the best interests of the ward[.]" The "best interest" inquiry is not weighted with a presumption in favor of adoption solely because mother is found to be unfit. *Dept. of Human Services v. T. M. D.*, 365 Or 143, 161, 442 P3d 1100 (2019). That determination is instead focused on the needs of the child, taking into consideration the unique circumstances of each case. *Id.* at 166; *see also Dept. of Human Services v. J. S. E. S.*, 315 Or App 242, 244-45, 501 P3d 556 (2021), *rev den*, 369 Or 209 (2022) (reiterating that the best interest determination is

"focused on the needs of the child" and concluding that keeping open an option of a permanent guardianship was not in the child's best interest given the parent's current capacity). Ultimately, to conclude that termination is in a child's best interest, we must be able to conclude that "the benefits to the child of ending the child's legal relationship with a parent outweigh the risk of harm posed to the child by severing that legal relationship." *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 53, 515 P3d 927 (2022).

The record in this case is clear that S is thriving in the care of her foster parents, who want to adopt her. S has significant needs that require ongoing therapy, social support, and a highly skilled caregiver who is responsive to her needs and who can advocate for additional services as she grows. S's current caregivers demonstrate a commitment to S and insight into taking care of her special needs. Further, S is bonded with her foster mother, who she has lived with most of her life. Because of S's developmental delays, Bennett noted that S was more vulnerable to any attachment disruptions and that the longer S's attachment to her current providers grows, the more detrimental a change in permanency would be to her later. Bennett recommended that S be placed with a permanent caregiver without further delay.

Conversely, S has spent most of her life out of mother's care and is not strongly bonded to her. At the time of the trial, mother demonstrated a continued lack of insight into S's developmental delays and need for ongoing therapeutic interventions. To be sure, a parent's unfitness to be a custodial resource does not present us with "a binary choice between terminating the parent's rights or returning the child to that parent's care"—a permanent guardianship is one other potential permanent arrangement. *Dept. of Human Services v. D. M. P.*, 317 Or App 529, 530, 504 P3d 1221 (2022). But the record here does not demonstrate that S had an interest in maintaining her legal relationship with mother and we are not persuaded that S was attached to mother by the time of the termination trial. *Cf. Dept. of Human Services v. D. E. P.*, 315 Or App 566, 571, 502 P3d 764 (2021) (concluding that the record lacks clear and convincing evidence that termination is in the child's best interests given that "B is attached to mother, and maintaining

a relationship with mother is important to B's well-being"). Evidence also shows that S was injured during a visit with mother and that mother's contact with S outside a therapeutic environment caused S emotional struggles. For instance, S's foster mother testified that the visits with mother were doing "a lot of damage" to S. S's developmental delays and high needs for proper care, together with mother's inability to safely parent and lack of understanding of S's needs, put S's health and skill development at risk. Accordingly, we are persuaded that the benefits to S of ending the legal relationship with mother clearly outweigh any risk of harm posed to S by a termination. We thus conclude that termination of mother's parental rights is in S's best interest.

Affirmed.