No. 520　　　　　July 31, 2024　　　　　55

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of K. M.-W. V.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. T.,
*Appellant.*

Marion County Circuit Court
22JU04732; A182578

Courtland Geyer, Judge.

Argued and submitted March 18, 2024.

George W. Kelly argued the cause and filed the brief for appellant.

Jona J. Maukonen, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General; and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Mother appeals from a judgment terminating her parental rights to her daughter based on unfitness, ORS 419B.504.[1] On appeal, mother argues that the Department of Human Services (DHS) failed to establish that she is unfit because it did not prove that child's reintegration into mother's home was improbable within a reasonable time, ORS 419B.504, and failed to prove that termination of her parental rights is in child's best interest, ORS 419B.500. On *de novo* review, ORS 419A.200(6), ORS 19.415(3)(a), we conclude that there is a sufficient record to support both findings and affirm the judgment terminating mother's parental rights.

We recount the evidence as necessary to explain our decision. The termination trial was in August 2023. Child was born in November 2020 and has been in substitute care with the same resource mother since shortly after her birth. Since child's birth, mother has lived with her partner, Vergara, who is not child's father.

Child was born with significant medical needs. Mother took her home after her birth but had to return to the hospital within a few days, and child was diagnosed with failure to thrive. Mother did not understand the seriousness of the diagnosis and what it meant and, prior to the DHS's involvement, was attempting to discharge child from the hospital. While in the hospital, neither mother nor Vergara could complete child's feedings, but the nurses could. Mother also refused DHS's offer of in-home parenting services, insisting that she did not need help. In mid-December, DHS placed child in substitute care with resource mother, who is a nurse, and child began gaining weight.

Child has been diagnosed with several conditions, including cerebral palsy, seizures, hip dysplasia, feeding and acid reflux issues, hearing loss requiring hearing aids, global developmental delay, autism, and legal blindness. She underwent surgery on her eyes to replace the lenses and, at the time of trial, was expected to have bi-lateral hip surgery and surgery to receive a gastronomy tube for her ongoing

---

[1] Child has no legal father.

feeding issues. Child takes three daily medications in liquid form that address her reflux, constipation, and allergies, and also requires daily eye drops.

Three months shy of her third birthday at the time of trial, child's neurodevelopment was around the age of nine months. She interacts differently than other children; she has five to 10 words and has difficulty pointing, her communication and eye contact are limited, she rarely cries, and she does not cue for hunger. Although child does not require a nurse caretaker, she does require a caretaker who is very attentive because she is somewhat mobile and exhibits self-harm behaviors like head-banging, and she is at risk for choking because she does not chew or swallow correctly. Child's limited communication means that she requires a caretaker who can understand her subtle cues so that they know when something is wrong. For example, child indicates pain by balling up her fists and stimming, but she hardly ever cries.

Child has five to eight medical appointments each month, usually in Portland, and receives five different in-home therapies at her home in Keizer through Willamette ESD. The in-home therapies include speech therapy to address her swallowing difficulties, occupational therapy for day-to-day activities, physical therapy for gross motor skills and movement, and hearing and vision therapy. Those therapies range from once-a-week to twice-a-month and involve hands-on coaching with child and her caregiver. To be effective, the caregiver must continue working with child outside of therapy sessions. Without the therapies, child could stall in her development, and she may need therapy long-term.

Mother is developmentally disabled, has a learning disability, and receives monthly disability assistance. Past testing assessed her as having a full-scale IQ of 63 and a verbal score of 75. In April 2021, mother underwent a psychological exam with Dr. Cook, during which she was unable to perform simple math calculations and exhibited signs of entirely concrete thinking and a deficient working memory. Cook opined that she possesses intellectual impairments of moderate severity and has symptoms consistent with PTSD and depression. In Cook's view, mother's diagnoses

and personality features would make it difficult for her to be a consistent parent, and she would need assistance with child's medications and appointments and with understanding instructions for her care. At trial, after observing mother's testimony, Cook opined that mother, with her long-standing cognitive and mental health issues, was not understanding at a detailed level child's significant needs and how to address them.

Rodewald, who was mother's caseworker from February 2021 to October 2022, testified that she would try to break up information for mother so that it was easier to understand and would look up videos or websites that could help explain child's diagnoses and would provide mother with those links. Rodewald also created a simplified list for mother of all of child's diagnoses and the services she was receiving, including the therapies from Willamette ESD, and informed mother of all of child's medical appointments. From July 2021 to January 2022, Rodewald arranged meetings for mother, her attorney, and child's various therapists so that mother could learn more, but stopped those meetings because mother found them overwhelming. At trial, mother could not remember any of the information she obtained from those meetings. Keating, mother's caseworker from October 2022 to August 2023, also notified mother of all of child's medical appointments, and arranged for mother to meet with a clinical social worker to help her understand child's medical needs.

Mother has attended many of child's medical appointments and remotely attended child's assessment results with Willamette ESD. She has missed some appointments due to misunderstandings or other things going on in her life. Mother testified that it is helpful to attend child's appointments because she can ask questions, though both Keating and resource mother testified that mother rarely asked questions at appointments. They both also expressed concern that mother did not understand child's medical conditions because mother would say things indicating that she thought child was developing normally and was more focused on child's clothes and hair than on learning about child's health. Mother has not been invited to attend child's

in-home therapies with Willamette ESD, because resource mother does not want mother in her home.

At trial, mother could not demonstrate an understanding of child's needs. She did not know what medications child was taking and was not sure what kind of services she needs. Mother testified that she needs to learn more to parent child, such as learning about all of child's medical issues, but also testified that she was ready for child to return home to her. She also described child as "very independent." Keating testified that mother has never acknowledged child's high needs or medical fragility.

Mother has consistently attended three weekly supervised visits with child, for a total of four hours per week. Vergara also attends those visits. For six months, beginning in August 2021, mother received hands-on parenting training twice a week for about an hour during visits with child. Initially, both mother and Vergara were misreading child's cues and mother would become frustrated with child's age-appropriate behavior. The goals of the training included redirecting child, reading cues, child milestones, stress strategies, parent-child attachment, encouragement of feeding child, and floor time with child. Mother testified that the training went "[v]ery well" and that she learned how to redirect child, though she said she did not learn anything else. The trainer testified that mother had made some improvements in redirecting child, but would also ignore the trainer's suggestions during visits and remained inconsistent, needing constant reminders to practice learned skills. Vergara showed more improvement but did not take initiative to interact with child. Due to mother's limited progress, DHS did not extend the service, which is typically only a three-month service, beyond the six months. Mother refused parenting services from Keating because mother considers herself a good parent to child.

Visit supervisors testified that mother interacts with child at visits, that the visits are pretty predictable, and that there is a bond between mother and child. They also testified that, over the course of the visits, mother's parenting abilities stayed about the same. Mother also would get upset and yell if visits began even a few minutes late

or if something changed, such as the person supervising the visit. On one occasion, mother became upset with her caseworker at the end of the visit and began yelling in front of child, who became upset and was still upset when she arrived back at resource mother's home.

Mother was also referred to a parent mentor, but was at times hostile toward the mentor and did not understand the concept of a mentor, despite her caseworker explaining it to her several times. After four months the service was stopped given that mother did not want to continue.

State-provided services were also available to child and mother through a direct support professional (DSP). Mother qualifies for only 24 hours of support per month from a DSP, which she can use for regular day-to-day support needs, but not for help with childcare. Mother has a developmental disability agent, who has referred her for a DSP, but mother does not have one yet. At trial, mother did not understand what a DSP could help her with and was not aware of other disability services. Child qualifies for 24 hours per month of DSP assistance for skill building, not to include childcare.

Mother testified that she has people in her life to help her with child, including her mother, her sister, and her cousins. However, the only thing she could identify that those people could do is take her and child to doctor's appointments. Vergara would also help her to take care of and parent child. At the time of trial, mother and Vergara had been living in a shared sober house for two years. Mother did not have substance abuse issues, but said it was "the only place I could go to get out of my mom's house." She testified that she was ready for child to live with her, and that she just needed to get her a bed. When Keating saw mother's room, it was very cluttered, and she did not see where child could be cared for safely. She also never got information from mother about her roommates, so that Keating could check whether they were safe to be around child.

Resource mother testified that she and her husband are interested in adopting child and that child is already well-integrated into their family, which includes four adopted children with high needs. DHS views her as the

potential adoptive parent and does not anticipate any problems in designating her as the adoptive placement. Resource mother testified that the idea of a permanent guardianship was raised with her, but she was not interested in a guardianship because mother becomes frustrated very easily over miscommunications, which could result in an altercation in front of child. Resource mother testified that she has concerns about mother's ability to manage her frustrations; mother will either yell or become aggressive or will refuse to talk about what happened and leave. Child becomes upset when mother yells in front of her, and resource mother did not think it was in child's best interest to expose her to that. Resource mother testified that she was willing to mediate an agreement with mother for visitation with child post-adoption and recognized the importance of maintaining that contact for child.

Dr. Towell, who conducted a psychological evaluation of child, testified that child has an extraordinarily high level of needs in both day-to-day care and in coordination of her many appointments. Towell opined that children with similarly high needs are vulnerable to challenges with attachments and to having unhealthy attachments, and that child has a higher need for permanency and for limiting transitions than other children. He further stated that child has a primary attachment to resource mother and that it is important to limit any further transitions. With regard to mother, Towell opined that "the research would not support the existence of a primary attachment relationship [with mother], but that certainly doesn't negate the possibility of a different type of relationship existing."

The juvenile court terminated mother's parental rights. It determined that mother is unfit and that integration of child into mother's home is improbable within a reasonable time based on mother's failure to make a lasting adjustment, to present a viable plan for child's return, and to learn the parenting skills needed to provide a safe and stable home for child. The court emphasized that its determination was not based solely on mother's disability, and also determined that termination was in child's best interest.

To terminate parental rights, the juvenile court must find, by clear and convincing evidence, that the parent is "unfit by reason of conduct or condition seriously detrimental to the child" and that "integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504. If the court finds that the parent is unfit, it must also find by clear and convincing evidence that freeing the child for adoption is in the child's best interests. ORS 419B.500. Here, mother challenges both findings of the juvenile court. Because we review the record in proceedings for termination of parental rights *de novo*, ORS 19.415(3)(a), we must examine the record with fresh eyes to determine whether the evidence developed below persuades us that it is highly probable mother is unfit and that termination is in child's best interests. *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 52, 515 P3d 927 (2022).

In her first assignment of error, mother argues that DHS failed to prove that integration of child into her home is not probable within a reasonable time. Mother asserts that DHS failed to do two critical things to assist mother: (1) it did not allow mother to participate in child's in-home therapies, and (2) it has not helped mother obtain developmental disabilities services for her and child.

We are not persuaded. The record demonstrates that, despite efforts to raise mother's awareness about child's significant medical needs and assist her in developing skills to parent child, mother continued to be unable to understand child's needs in any detail and failed to consistently respond to child's cues without prompting. Although mother was not included in the in-home therapies, she was given the opportunity to participate in regular meetings about child's needs, including meetings with child's therapists, but was unable to continue with those meetings because she felt overwhelmed. At trial, mother could not remember any of the information conveyed during those meetings, and she could not identify child's current services or medications. In addition, at visitation, mother received six months of hands-on parenting training, but still required constant reminders throughout the training to use the skills she had

been taught. At trial, mother could only name redirection as a skill that she learned after six months. Visit supervisors also testified that her parenting skills stayed about the same. Given mother's history and minimal progress in other services, we conclude that including mother in child's in-home therapies would not have appreciably improved mother's ability to integrate child into her home within a reasonable time.

We similarly find that developmental disabilities services would not make it likely that child could be integrated into mother's home within a reasonable time. The record shows that mother qualified for 24 hours per month of DSP assistance with her own day-to-day support needs, not to include childcare, and that child qualifies for 24 hours per month of DSP assistance for skill building, not to include childcare. That level of assistance would not be sufficient to address child's significant daily care needs. The record also indicates that it was unknown when a DSP or other disability services provider could be available to mother or child, and that mother did not know how a DSP could assist her.

On *de novo* review, we are persuaded that the evidence is clear and convincing that mother is unfit to parent child.

In her second assignment of error, mother argues that DHS failed to prove by clear and convincing evidence that terminating her parental rights is in child's best interests. She argues that she and child have a bond and that resource mother could continue to care for child as a guardian, while leaving her status as child's mother intact. Mother asserts that the juvenile court deferred to the resource mother's preference for adoption instead of making the required best interests finding. Mother also challenges DHS's suggestion that, because a guardianship ends at age 21 and child will likely need care into adulthood, adoption is in child's best interests.

We first address DHS's preservation challenge to mother's assertion that a guardianship is more appropriate than adoption for child. Asserting on appeal that a specific type of guardianship is the appropriate permanency option

for a child is an argument that should be preserved below to develop a full record on this issue. *See Dept. of Human Services v. J. M.-A.*, 333 Or App 334, 335-36, ___ P3d ___ (2024) (providing that the father's references in the juvenile court to a "guardianship" and his stated expectation that he would have custody of the child did not preserve the argument that a permanent guardianship was in the child's best interest). We agree with DHS that mother did not preserve her arguments on appeal that a guardianship was in child's best interests. Nonetheless, in addressing on *de novo* review whether DHS established that termination is in child's best interests, we reiterate that "[c]ases where a parent is unfit to be a custodial resource do not present us with a binary choice between terminating the parent's rights or returning the child to that parent's care, nor is adoption the only permanent option available to a child whose parent is unfit." *Dept. of Human Services v. D. M. P.*, 317 Or App 529, 530, 504 P3d 1221 (2022). Rather, on *de novo* review, we must examine the record ourselves and determine whether we are persuaded that termination of mother's parental rights is in child's best interests. *L. M. B.*, 321 Or App at 52. With that in mind, we do consider the issue of guardianship, to the extent it was developed in the record, in our determination.

We ultimately are persuaded that termination of mother's parental rights is in child's best interests.[2] The record establishes that child has developed a primary attachment to resource mother, who wishes to adopt her. Although mother and child have some type of bond, Towell opined that it is not a primary attachment, and that opinion is supported by other testimony in the record about child's demeanor with mother and others. Resource mother has adopted other high-needs children and knows how to care for child and access services for her. Resource mother is willing to negotiate an agreement for ongoing contact between mother and

---

[2] We reject DHS's argument that adoption is superior to guardianship based on the idea that a guardianship ends when a child turns 21 and this child likely will need continued support as an adult. As we recently explained, although adults with disabilities may rely on caregivers to advocate on their behalf, "there is no clear legal requirement that imposes parental obligation to do so when a severely compromised child reaches adulthood. Accordingly, the end of a wardship when [a] child turns 21 does not establish that adoption is necessary to [a] child's best interests[.]" *J. M.-A.*, 333 Or App at 340-41.

child and understands the importance of such contact for children. The record establishes that mother becomes frustrated very easily over miscommunications and unexpected changes, which causes mother to respond aggressively or to disengage altogether, responses that would be harmful to child and potentially disruptive in the context of a guardianship for child. Towell also explained the importance of minimizing any transitions for child and preserving child's primary attachment. On *de novo* review, given the circumstances of this child, on this record, we are persuaded by clear and convincing evidence that termination of mother's parental rights is in child's best interests, leaving child's adoptive parents to accommodate whatever continuing contact with mother is in accordance with child's best interests.

Affirmed.