No. 820          November 14, 2024          221

***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of C. M. E. I.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. M. I.,
*Appellant.*

Lane County Circuit Court
22JU05798; A183409 (Control)

In the Matter of B. A. I.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. M. I.,
*Appellant.*

Lane County Circuit Court
22JU05803; A183411

Karrie K. McIntyre, Judge.

Submitted October 4, 2024.

Aron Perez-Selsky filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

SHORR, P. J.

Affirmed.

**SHORR, P. J.**

Mother appeals from judgments terminating her parental rights to her children, B and C, on the basis of unfitness, ORS 419B.504, and that it is in the children's best interest that mother's rights be terminated, ORS 419B.500.[1] On appeal, mother does not contest the juvenile court's determination regarding her fitness to parent the children. Rather, in two assignments of error—one for each child— she challenges only the determination that termination of her parental rights is in B's and C's best interest. We conclude that clear and convincing evidence establishes that termination of mother's parental rights is in the children's best interest. Accordingly, we affirm.

Our review is *de novo* under ORS 19.415(3)(a). "That standard requires us to examine the record with fresh eyes" to determine whether termination of mother's parental rights is in B's and C's best interest. *Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750, 432 P3d 1186 (2018), *rev den*, 365 Or 556 (2019). Under the applicable clear-and-convincing-evidence standard, "we must be persuaded by the evidence that it is highly probable that termination" is in the children's bests interest. *Id.* The determination of whether terminating the legal relationship between a parent and child is in the child's best interest "requires a fact-specific, child-centered inquiry," and we have previously identified several considerations that inform that determination, including: "(1) the strength of the bond between the parent and child; (2) whether severing that bond will help or harm the child; (3) the benefits to the child of terminating parental rights; and (4) the risk of harm to the child posed by termination." *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 52, 53, 515 P3d 927 (2022). "Facts that demonstrate the parent's unfitness also may demonstrate that it is in the child's best interest that the parent have no further relationship with the child." *Dept. of Human Services v. T. M. D.*, 365 Or 143, 162, 442 P3d 1100 (2019).

On appeal, mother argues that the juvenile court erred in determining that termination of her parental rights was in the best interest of the children because (1) the children were bonded to her, notwithstanding the significant

---

[1] The father of B and C is deceased.

impediments to contact, (2) mother was participating in services that would permit her to enjoy a positive, mutually beneficial relationship with her children, and (3) the evidence did not describe why adoption, rather than permanent guardianship, could not afford the same stability the children require. In response, the Department of Human Services (DHS) argues that the record does not support mother's argument that the children are so strongly bonded to her that termination of her parental rights would be detrimental to them, that mother's long history of substance abuse and her failed attempts at treatment suggest that she would be able to play only a minimal role in the children's lives, and that this is a case where termination of mother's rights in order to free the children for adoption is necessary to provide B and C the consistent and permanent placement they need.

Both children were taken into protective custody in January 2021 based in part on concerns about domestic violence and mother's ongoing substance use. The juvenile court took dependency jurisdiction over the children in April 2021, based on mother's admissions that her substance abuse and mental health issues interfered with her ability to parent.[2] At the time of the termination trial, which began on October 26, 2023, B was eight years old and C was four years old.

Mother has had long-term struggles with substance use, including the use of cocaine, methamphetamine, heroin, and fentanyl. Mother was provided with referrals by DHS for substance use treatment, but she was unwilling to participate in inpatient treatment as recommended and, although she attempted to participate in outpatient treatment, she did not complete any treatment services and has been unable to achieve and maintain sobriety since the court took jurisdiction over B and C. There is evidence in the record that without significant and substantive long-term inpatient treatment, her prognosis to address mental health issues and substance abuse issues is poor.

---

[2] DHS was also previously involved with B after he was born, in part, due to mother's substance abuse.

During the pendency of this case, mother engaged in supervised parenting time with both children until her time with B was suspended in approximately June 2022 due to B's significant and dangerous behavioral issues associated with the visits, including running away from the adults in the building and again in the parking lot; after that, mother only had visits with C. Mother often appeared to be under the influence of substances when she went to see the children. The consultant who conducted a permanency evaluation for B and C observed two family visits in May 2022 and described them as "disastrous" and testified that out of her experience in watching hundreds of hours of visits, "they were some of the most unsafe and chaotic visits" that she had observed; she recommended at that time that all visits be stopped for the best interest of the children—both emotionally and physically. Despite the fact that DHS would intervene and attempt to redirect mother's concerning behaviors during visits, she would not change her behaviors.

B and C are in separate placements, and they do not have a strong sibling bond. B is currently living with a step-grandparent, who is an adoptive resource. When B was moved into foster care, he struggled with emotional regulation, behavioral outbursts, language delay, and social delay. He has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), Inattentive Type, as well as a language disorder and trauma and intermittent explosive disorders. B needs a permanent placement with a family who can tolerate outbursts and work with providers to help B improve emotional and behavioral regulation; his current placement is willing to do so. Although B has made progress, he will need ongoing professional intervention to address his issues.

C struggled with emotional regulation, behavioral outbursts, language delay and social delay when she was first moved to foster care. With effort and professional intervention, her behaviors have stabilized, and she has made considerable gains in language and social skills. She has been diagnosed with reactive attachment disorder and will likely struggle to form a close bond with caregivers. It is extremely important for C to have a stable, permanent home where she can fully attach to caregivers. C is currently

living in a foster placement that is not an adoptive resource; once she is freed for adoption, DHS can begin to locate an appropriate adoptive resource for her.

On appeal, mother argues that notwithstanding the opinion of DHS's professional witnesses, the children's own words and behavior signaled that they were still bonded to mother. DHS responds that there is ample evidence in the record that establishes that the children do not have a healthy bond with mother. Having reviewed the entire record *de novo*, we agree with DHS that there is not a strong bond or attachment between either child and mother. We also agree with DHS that the evidence in the record supports a determination that it is unlikely that mother will be able to achieve and maintain sobriety and play a positive role in the children's lives, contrary to mother's assertion otherwise. Lastly, the evidence in the record supports a determination that adoption, rather than guardianship, is the appropriate plan to address the specific needs of both children.

We conclude by clear and convincing evidence, as did the juvenile court, that termination of the parent-child relationship between B and mother and C and mother is in the children's best interest. Clear and convincing evidence also supports the conclusion that the benefits to B and C of ending their legal relationships with mother and freeing them for adoption outweigh the risk of harm posed by severing the relationships.

Affirmed.