Submitted May 27, reversed August 11, petition for review denied November 4, 2021 (368 Or 702)

In the Matter of A. L. H. V.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. F. R. M.,
*Appellant.*

Josephine County Circuit Court
19JU07478; A175072

497 P3d 802

Mother appeals a juvenile court judgment terminating her parental rights to her son. She does not challenge the juvenile court's finding that she is unfit to be a custodial resource for child, but contends that the Department of Human Services (DHS) failed to meet its burden to establish by clear and convincing evidence that termination of her parental rights is in child's best interests. *Held*: On *de novo* review pursuant to ORS 19.415(3)(a), the Oregon Court of Appeals concluded that DHS did not establish that termination of mother's parental rights is in child's best interests by clear and convincing evidence.

Reversed.

Sarah E. McGlaughlin, Judge.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Sarah Peterson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Stacy M. Chaffin, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and Landau, Senior Judge.

ORTEGA, P. J.

Reversed.

**ORTEGA, P. J.**

Mother appeals a juvenile court judgment terminating her parental rights to her son. She does not challenge the juvenile court's finding that she is unfit to be a custodial resource for child, but contends that the Department of Human Services (DHS) failed to meet its burden to establish by clear and convincing evidence that termination of her parental rights is in child's best interests. On *de novo* review pursuant to ORS 19.415(3)(a), we conclude that DHS did not establish that termination of mother's parental rights is in child's best interests by clear and convincing evidence. Accordingly, we reverse the judgment terminating mother's parental rights.

To grant a petition to terminate parental rights, the juvenile court must first find that DHS has proved at least one basis for terminating parental rights under ORS 419B.502 to 419B.510. In this case, the juvenile court found that mother is "unfit by reason of conduct or condition seriously detrimental to the child" and that "integration of the child * * * into [her] home * * * is improbable within a reasonable time due to conduct or conditions not likely to change," under ORS 419B.504, and also that the prior termination of mother's parental rights to child's two siblings constituted "extreme conduct," under ORS 419B.502. Mother does not challenge those findings on appeal.

However, the court must also find that permanently and irrevocably severing the legal parent-child relationship serves the particular child's best interest, under ORS 419B.500.[1] Thus, our *de novo* standard "requires us to examine the record with fresh eyes to determine whether the evidence developed below persuades us that termination is in [child's] best interest." *Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750, 432 P3d 1186 (2018), *rev den*, 365 Or

---

[1] ORS 419B.500 provides:

"The parental rights of the parents of a ward may be terminated as provided in this section and ORS 419B.502 to 419B.524, only upon a petition filed by the state or the ward for the purpose of freeing the ward for adoption if the court finds it is in the best interest of the ward. If an Indian child is involved, the termination of parental rights must be in compliance with the Indian Child Welfare Act. The rights of one parent may be terminated without affecting the rights of the other parent."

556 (2019). In addition, because DHS must establish the child's best interests by clear and convincing evidence, "we must be persuaded by the evidence that it is highly probable that termination of mother's parental rights is in [child's] best interest." *Id*.

We recount the evidence pertinent to that inquiry. The juvenile court took jurisdiction over child and his two older siblings nearly three years before the termination trial, when child was almost two years old. For the last two years preceding the termination trial, child has been in a stable foster placement with his two older siblings. As mother does not contest, he has thrived in that placement and is attached to his foster parents, who would like to adopt him. He also has secure attachments to his two older siblings.

Mother's parental rights to the two older children were terminated in a separate proceeding the year before the termination trial in this case. Mother did not appear for that trial and her rights were terminated by default; she and her mother (grandmother) both testified that they appeared the day after the trial by mistake and both were heartbroken. Grandmother was very involved in the lives of all three children prior to their removal from mother's care, frequently serving as their caregiver; she regularly participated in visitation with the children prior to the termination of mother's rights to the two older children. A mediation with foster parents regarding continuing contact with the two older children, who foster parents have adopted, was attempted but terminated by foster parents. Neither mother nor grandmother had seen the two older children for at least six months before the termination trial in this case.

Mother has a history of problematic drug use; during the course of the dependency cases involving all three children, she used heroin intravenously and also smoked methamphetamine. Her drug use resulted in numerous arrests, criminal convictions, periods of incarceration, and a term of probation. She started drug treatment several times with little to no success. At the time of the termination hearing, mother acknowledged that she was not yet in a position to be a custodial resource for child and that she had used heroin the day before the hearing. However, she intended to

engage in a medically assisted treatment program and was optimistic that she could eventually attain sobriety. She was living with grandmother, who had observed recent positive changes in mother.

Mother participated in visits with child during the period of the dependency case, although she also occasionally missed visits, which was upsetting to child. Grandmother also regularly participated in visits with child. The DHS caseworker, Palmer, acknowledged that child is bonded to mother and also to grandmother, who was an important person in his life.

Palmer testified that adoption was in child's best interests and that he is bonded to foster parents, who wish to adopt him. A psychologist, Wixson, who had last evaluated child 20 months before the termination trial and had not met mother or evaluated child's attachment to her, also testified that child had needed permanency at the time of Wixson's evaluation, and even more so 20 months later. However, both Palmer and Wixson equated permanency with adoption in their testimony. Palmer opined that adoption was the "most permanent" option and expressed the view that, with a guardianship, the parent retains "the ability to take the adoptive parents back to court and try to obtain custody of the child." Wixson's testimony likewise addressed only "permanency through adoption" and assumed that anything short of adoption would risk disrupting child's relationship with his primary caregivers. Both witnesses' testimony emphasized the importance of preserving child's placement with foster parents and assumed that adoption was the only way to do so.

Both witnesses also emphasized the fact that child's siblings had been adopted and speculated that child would suffer if he did not have the same legal status as his siblings. Palmer opined that child "deserves to be in the same plan as his siblings" and that a guardianship would "kind of singl[e child] out, not being able to be adopted with his siblings." She noted that child is aware that his siblings have been adopted "and he's been educated to the best of his ability to understand on adoption," but acknowledged that "[h]e is still really young, and so he doesn't have a real solid stance

on it." Nevertheless, he is "comfortable," and calls the foster parents "mom and dad" and views them as his "parental figures." Wixson also speculated that child would be stressed if he were kept in "limbo" and became increasingly aware that he did not have permanency, but his siblings did.

In concluding that termination was in child's best interests, the juvenile court accepted the framing offered by DHS and its witnesses, emphasizing the "serious risk of negative effects" if child's secure placement with the foster parents was "disrupted." In a letter opinion, the court noted:

> "Freeing the child for adoption would allow him to maintain his daily interaction and bonds with his older siblings. The foster parents are potential adoptive resources and have already adopted the child's two older siblings. * * * Wixson testified that as children grow older, their awareness increases as to a lack of permanency. DHS caseworker Palmer testified that the child is aware that his foster parents have adopted his older siblings. A different level of permanency, such as guardianship, would be less permanent than adoption and exceptionally confusing for a child living in a home where his other two siblings were adopted."

Although the court acknowledged that mother loves child and "when she is present, she is a good parent," and also acknowledged that child is attached to grandmother and that losing his relationship with her would "certainly be a negative" to child, the court concluded that, "[i]n balance, * * * it is in the child's overall best interest to remain in his current placement with the knowledge that this is a permanent arrangement."

At the termination trial and again on appeal, mother does not challenge that child is in a secure placement that should be maintained. She contends only that a continuing relationship with her and with grandmother is in his best interests and that a permanent guardianship would secure that relationship while entrusting to the court the *question* of continuing contact with mother. For its part, DHS continues to equate permanency with adoption, emphasizing the importance of child remaining in his current placement permanently. It acknowledges that child is bonded to mother and grandmother but argues that termination would not necessarily mean that his relationship with them would end

given that the foster parents are willing to participate in a mediation.

We conclude that the juvenile court erred in deciding that DHS had met its burden to establish by clear and convincing evidence that termination of mother's parental rights is in child's best interests. In reaching that conclusion, we reject the premises underlying the juvenile court's determination—specifically, as urged by DHS that permanency can only be achieved through adoption and that clear and convincing evidence establishes that child will suffer if his legal status differs from that of his siblings.

First, as we have in the past, we reject the notion, advanced by DHS below through counsel and through the testimony of Palmer and Wixson, that permanency can only be achieved through adoption. In *Dept. of Human Services v. T. M. D.*, 365 Or 143, 158, 442 P3d 1100 (2019), the Supreme Court explained that a permanent guardianship can fulfill a child's need for permanency and adoption is not the only option for doing so. As the court explained in *T. M. D.*, and as we emphasized recently in *Dept. of Human Services v. M. H.*, 306 Or App 150, 164, 473 P3d 1152 (2020), a permanent guardianship is permissible only if the juvenile court finds that the grounds for termination of parental rights are met and finds that it is in the child's best interest that the parent never have physical custody of the child. ORS 419B.365(2). Accordingly, a permanent guardianship is not a temporary arrangement and a parent cannot seek to vacate it. ORS 419B.368(7).[2]

Second, it logically follows that a child is not necessarily subjected to a realistic fear that his placement is insecure despite the absence of an adoption. *T. M. D.* involved a child whose mother, like mother in this case, experienced a continuing problematic heroin addiction and was in a secure placement with his foster parents. The court emphasized that the record in that case lacked evidence that the child's need for permanency constituted "a need to have legal

---

[2] As the court noted in *T. M. D.*, "[a]lthough a *court* may vacate a permanent guardianship on its own motion or the motion of a party other than a parent, ORS 419B.368(1), the court's decision to do so must be in the child's best interests, ORS 419B.368(2)." 365 Or at 165 (emphasis in original).

assurance that no court will ever change his placement." *Id*. Rather, the evidence was that the child needed immediate security which could be provided through a permanent guardianship, and there was no reason to fear, for example, that the mother "would not accept his uncle and aunt as his permanent caregivers." *Id*.

Likewise here, the record does not establish by clear and convincing evidence that child's need for permanency demands that he have the same legal status that his siblings have. As is the case with any legal matter, it is the responsibility of adults to communicate to child what he needs to know about the permanence of his legal relationships—indeed, the record establishes that child calls his foster parents mom and dad, is very securely attached to his siblings, and that mother is supportive of him remaining in his current placement. The risks of mother disrupting that placement, which motivated the concerns expressed by Palmer and Wixson, are not valid assessments of the risks presented by a permanent guardianship and need not be sources of anxiety to child.

Finally, as Palmer acknowledged, child is attached to both mother and grandmother. We give significant weight to the importance of preserving a child's relationship with his biological parent where that is possible to do consistent with his best interests. Indeed, even while assuming (incorrectly) that adoption was necessary to preserve child's current placement, Wixson noted in his testimony that maintaining a child's significant relationships is advisable and that children become curious about their biological parents as they grow older. Here, the record lacks clear and convincing evidence that child's best interests demand that mother's relationship with him should be legally severed so that any further contact is entrusted entirely to the discretion of adoptive parents—and indeed, entrusting the question of further contact to adoptive parents after the court has concluded that the child's best interests require termination of all parental rights may well serve to reinforce an understandable inclination to conclude that further contact is not advisable. In the context of a termination of parental rights proceeding, it is the court's responsibility to protect a child's

best interests, not to assume that the child's future parents will do so. We conclude, on *de novo* review of the record, that DHS has failed to establish, by clear and convincing evidence, that termination of mother's parental rights is in child's best interest.

Reversed.