Submitted June 8, affirmed August 30, 2023

In the Matter of R. L. M.,
aka R. M., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. M. M.,
*Appellant.*

Umatilla County Circuit Court
22JU00310
A180292 (Control)

In the Matter of L. A. M.,
aka L. A. M., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. M. M.,
*Appellant.*

Umatilla County Circuit Court
22JU00312; A180293

535 P3d 800

Mother appeals from a judgment terminating her parental rights to two of her children. On appeal, mother argues that termination of her parental rights is not in her children's best interest due to the stability she achieved in the months before the termination trial and the testimony of several witnesses that having contact with her would be positive for the children. *Held*: Based on the particular circumstances in this case, which includes the children's lack of attachment to mother and strong attachment to their current caregivers, who are also the proposed adoptive parents, and mother's history and lack of insight into the children's needs, termination of mother's parental rights is in the best interest of the children.

Affirmed.

Eva J. Temple, Judge.

George W. Kelly filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Mother appeals from a judgment terminating her parental rights to two of her children, L and R. On appeal, mother does not challenge the juvenile court's determination that she is unfit under ORS 419B.504, but instead challenges only the court's determination that termination of her parental rights is in her children's best interest, as required by ORS 419B.500. Our *de novo* standard for review of termination cases, ORS 19.415(3)(a), "requires us to examine the record with fresh eyes to determine whether the evidence developed below persuades us that termination is in [the children's] best interest." *Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750, 432 P3d 1186 (2018), *rev den*, 365 Or 556 (2019). In addition, because the Department of Human Services (DHS) must establish best interest by clear and convincing evidence, "we must be persuaded by the evidence that it is highly probable that termination of mother's parental rights is in [the children's] best interest." *Id*. In the circumstances of this case, we are persuaded that DHS met that burden, and we therefore affirm.

Because mother challenges only the best interest determination, we limit our discussion of the facts to those most relevant to that determination. The children were removed from mother's care more than four years ago, in June 2019, when L was three years old and R was 15 months old. The children were placed with mother's sister and brother-in-law (the children's aunt and uncle) and have remained there since then. Aunt and uncle are the proposed adoptive parents as well. Mother and aunt did not have a good relationship at the time of the original placement and, some time after the children were placed with aunt, mother made death threats toward aunt on social media, prompting aunt to obtain a restraining order against mother. That order has since expired and, by the time of trial, mother and aunt had begun to engage by phone and exchange of letters.

The juvenile court took jurisdiction of the children based on allegations regarding mother's criminal activities, substance abuse, failure to maintain a safe environment for the children, and exposing them to domestic violence. For the first 16 months that they were out of her care, from

June 2019 to November 2020, mother was on probation and was using methamphetamine and alcohol with some periods of sobriety. She completed substance abuse assessments but did not begin any recommended treatment. She only visited L twice and R once during that period, and her visits were suspended after she became verbally and physically aggressive in the DHS office, screaming and ripping items off the walls. Mother attributed the lack of visits during this period to DHS cancelling visits that she had scheduled, for no reason, and changing the phone number so that she could not reach DHS.

Mother's probation was revoked in December 2020, and she spent the next year, until November 2021, in county jail. During that time, mother was often in segregation due to her behavior and, as a result, arranging for visitation was difficult. Mother had one video visit with the children in October 2021. In November of that year, mother pleaded guilty to a felony charge pending from before she entered jail and another felony charge that arose out of her conduct in jail, and she was sentenced to prison and moved to Coffee Creek Correctional Facility. Her earliest scheduled release date is in April 2024.

At Coffee Creek, mother was diagnosed with "unspecified schizophrenia" or "unspecified psychotic disorder," and began taking antidepressant and antipsychotic medications that the prison manages. She became more stable and has begun to achieve some insights. If mother were to stop her medication, she would regress into depression and possibly psychosis. Mother has remained sober while incarcerated but has not engaged in any treatment.

After stabilizing, mother began writing to the children and to aunt. She also enrolled in a parenting program. Mother testified that her relationship with aunt had improved, while aunt testified that they recently had had "a couple" of positive interactions. About six months before the termination trial, mother resumed visitation with the children by video once a month. Mother believes that the visits go "really well," that the children enjoy interacting with her, and that they have a loving and secure bond with her. However, aunt and the visitation caseworker testified

that the children's engagement with mother is "very surface" or "minimal" and that the children are not connected with mother. At best, L has an attachment to mother that is "elementary" and "lacks development," while R does not understand mother's relationship to him.

The children have been doing well in their placement with aunt and uncle, with whom the children are bonded as parents. They are also bonded to the couple's children as siblings. Aunt has been facilitating L and R continuing a relationship with their older brother, their maternal grandmother, L's paternal grandparents, and other extended family, in addition to facilitating the video visits with mother.

When L came into care with aunt and uncle, she exhibited some concerning behaviors that resolved after about a year. However, since resuming visitation with mother, L again began wetting her bed. She has post-traumatic stress disorder, and attention-deficit/hyperactivity disorder (ADHD) and learning disabilities will need to be ruled out once she begins school. L told her evaluator that she wanted to stay with aunt. When R came into care, he struggled with tantrums, but therapy with aunt helped. He has an adjustment disorder with disturbance in conduct, and ADHD will need to be ruled out. The psychologist who evaluated the children, Dr. Giesick, testified that they have "high needs" and will need parental advocacy in the school system, and that R needs parental support for his development. Aunt testified that the children thrive with structure and routine, and that when their routine is off, "their behavior is off as well."

Giesick opined that, despite being with aunt and uncle for some time, the children are still exhibiting stress from a lack of permanency, and that adoption by aunt and uncle is in their best interest. She primarily based that opinion on their young age, their lack of attachment to mother, and because adoption signals a "forever" placement to children, where a guardianship does end at some point when a child reaches majority. She further testified that "the risk of them not getting permanency is much more worrisome" than any risk of severing the legal bond with mother.

Aunt testified that, once mother is out of prison and has some stability, contact with her would "absolutely" be positive "if she [can] show up for [the children] in some capacity when she's available \*\*\* as long as it's safe." However, aunt did not wish to engage in preadoption mediation with mother because of the abuse she experienced from mother and because she did not believe that mother was willing to work with her as the children's parent. She also was concerned about maintaining control over any contact because of mother's past substance abuse and behavioral history.

Moody, a DHS caseworker for the family from June 2021 to July 2022, also opined that the most appropriate plan for the children was adoption, though she also thought it would be healthy for the children to continue to have contact with mother even if her rights were terminated. The DHS caseworker currently assigned to work with the family, Kent, testified that the children would benefit from developing positive interactions with mother. Kent also testified that stability was most important for the children because, given their trauma, they need to feel safe and "like they're not going to be bouncing around."

Mother testified that she believed that she and the children were bonded, that they were attached to her, and that she would be ready to parent them within six months of her release from prison. She expressed the belief that it would be in their best interest to be placed with her or with her mother (their maternal grandmother), and that the children would not experience trauma if they were removed from aunt's care. The DHS caseworkers and Giesick testified that such a move would be traumatic or detrimental for the children due to the bond between them and their caregivers and the length of time spent in their care.

The juvenile court determined that DHS had proved by clear and convincing evidence the statutory grounds for terminating mother's parental rights.

On appeal, mother argues that it is not in her children's best interest to terminate her parental rights. She notes that she is currently sober and intends to complete treatment. She also expressed that she would not return to

drug use upon her release from prison. She further urges that her mental health needs are being met, that she has reestablished positive relationships with aunt and the children, and that several witnesses testified that future contact with mother would benefit the children. Mother argues that a permanent guardianship with aunt is a better fit for the children than terminating mother's parental rights, because it would give them permanency while allowing mother some level of court-ordered contact.

On *de novo* review, we are persuaded that, in the circumstances presented here, it is in the children's best interest to terminate mother's parental rights and to free them for adoption by aunt and uncle, even while we recognize the value of continued contact with mother. We note first that the children are not bonded to mother, given their young ages and the length of time they have been out of her care. At best, L's attachment to mother is elementary and R is not attached to her at all, in contrast to cases where a child's attachment to the parent is compelling evidence that terminating the parent's rights is not in the child's best interest. *See, e.g.*, *Dept. of Human Services v. T. M. D.*, 365 Or 143, 165, 442 P3d 1100 (2019) (substantial evidence in the case established that child had an interest in maintaining his relationship with his mother); *T. L. M. H.*, 294 Or App at 751 (the record showed that the child was strongly bonded to his mother and older sister). That lack of attachment, while understandable, is especially concerning given that mother does not evince a realistic view of the attachment the children have to her or their caregivers and does not evince awareness of their needs, raising significant doubt about her ability to meet the children where they are at in order to create a stronger bond with them.

Second, the children are strongly bonded to their current family, where they have stabilized and improved. L expressed a desire to stay with them. Maintaining those bonds is important for the children and removing them from the family, as mother suggested should happen at trial, would be traumatic for them. Aunt has also demonstrated her willingness to facilitate the children's relationships with other members of their family, including their older brother,

their maternal grandmother, L's grandparents, and mother. Aunt's only reservation with allowing the children to have contact with mother is that aunt needs to have control of that contact to ensure that it is safe for mother to be around the children—that is, that mother is stable and sober. That reservation is appropriate given mother's history of instability and extreme behavior, including toward aunt, when she is not medicated and sober, and because mother has not yet maintained such stability outside the prison environment. While termination of mother's legal relationship with the children is significant, the record here supports the view that aunt understands the value of contact with mother if it can be managed safely, and also offers a basis for her concern about the need to manage that contact.

Third, all the witnesses, other than mother, testified about the importance of permanency for the children that preserves their primary attachments. Mother, on the other hand, testified that what was best for the children was to live with either her or their maternal grandmother, and she did not believe that the children would experience trauma if they were moved from aunt and uncle's home. That testimony and mother's history raises doubt about the efficacy of a permanent guardianship in this case; there is a potential that mother would try to interfere with aunt and uncle becoming the permanent guardians of the children, or may not respect the boundaries of an established guardianship. Any further delay in permanency or any confusion or disruption by mother to an established guardianship—even if mother could not undo the guardianship itself—would not be in the children's best interest. *See Dept. of Human Services v. W. L. J.-E.*, 324 Or App 121, 124-25, 524 P3d 989 (2023) (taking into consideration father's substance abuse and mental health history, poor compliance with treatment, and past inability to conform his conduct to court and societal expectations, in determining that termination of father's parental rights was in the child's best interest).

Having set out our reasons for concluding that termination is in the children's best interest, we acknowledge that mother has made positive improvements in the months leading up to the termination trial and that the children

could benefit from future positive interactions with mother. Although fostering such positive interactions in the future could be of benefit to the children—as such positive relationships with a child's birth mother are generally beneficial to any child—that generalized benefit does not outweigh the clear and convincing evidence presented here that what is in these children's best interest is termination of mother's parental rights.

Affirmed.