No. 318 April 22, 2026 651

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. D. D. C., aka A. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

A. D. D. C.,
aka A. C.,
*Respondent,*

*v.*

K. R. K.,
*Appellant.*

Multnomah County Circuit Court
24JU01075; A188129

Jacqueline L. Alarcón, Judge.

Argued and submitted December 17, 2025.

George Kelly argued the cause and filed the brief for appellant.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent Department of Human Services. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Interim Deputy Attorney General.

Christa Obold Eshleman and Youth, Rights & Justice filed the brief for respondent A. D. D. C.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

HELLMAN, J.

Reversed.

**HELLMAN, J.**

Mother appeals from a judgment terminating her parental rights to her son, A, who was three years old at the time of trial. On appeal, mother assigns error to the juvenile court's rulings that she is unfit to parent A and that integration of A into her home is improbable within a reasonable time under ORS 419B.504, and that termination of her parental rights serves A's best interests under ORS 419B.500. On *de novo* review, we conclude that clear and convincing evidence establishes that mother suffers from cognitive difficulties that inhibit her ability to safely parent A, who, as a result of physical abuse that he sustained while in mother's custody and her failure to timely seek medical care, is developmentally delayed and has high medical needs. That is, mother's conduct and condition pose a serious detriment to A. In addition, we conclude that clear and convincing evidence demonstrates that A cannot be safely integrated into mother's home within a time reasonable for A due to mother's limited progress in developing the skills necessary to safely parent A over three years. However, we determine that ODHS did not carry its burden to prove that terminating mother's parental rights is in A's best interests. Specifically, ODHS failed to prove that there would be harm to A from a continued legal relationship with mother or that termination of mother's parental rights is somehow necessary for A's best interests. That evidentiary deficiency is highlighted in ODHS's failure to develop evidence on the issue of permanent guardianship, an alternative pathway to permanency that would preserve A's legal bond with mother. Therefore, we reverse.

## I.  FACTS

A.  De Novo *Review*

In proceedings for termination of parental rights, we review the record *de novo*. ORS 419A.200(6); ORS 19.415(3)(a). We therefore recite the pertinent facts in light of our obligation to "examine the record with fresh eyes to determine whether the evidence developed below persuades us that it is highly probable" that mother is unfit, that integration is improbable within a reasonable time, and that termination

is in child's best interests. *Dept. of Human Services v. K. T.*, 334 Or App 55, 62, 554 P3d 832, *rev den*, 372 Or 787 (2024).

B. *Background*

A was born premature and underweight in January 2022. He spent a few days in the neonatal intensive care unit before being discharged to his parents' care. He struggled to gain weight at a healthy rate and, at some point, was diagnosed with "failure to thrive." When A was two months old, he suffered significant bruising while in father's presence, to the extent that A had a black eye. A's parents did not seek medical attention and later claimed that A sustained those injuries from falling off a couch.

Father communicated to mother that he could not safely care for A due to father's mental health issues. Mother was aware that father suffered from blackouts and had a habit of roughly handling and squeezing A. Yet mother continued to defer to father for childcare decisions. And she continued to leave A with father unattended.

C. *Events Leading to Child's Removal and Dependency Jurisdiction*

On May 15, 2022, while mother was at work, father informed her that he had accidentally "dropped" four-month-old A. A sustained substantial bruising and injuries from that incident, but his parents again did not take him to the hospital. Mother continued to go to work and leave A with father. Over the next few days, A developed a fever and began vomiting. Mother did not connect A's worsening symptoms to his recent "fall." Father called the nurse advice line and relayed A's symptoms. He was advised to immediately take A to the hospital. His parents did not. At some point, A began seizing. Mother became concerned and expressed that she wanted to take A to the hospital. Father brushed her off, and mother yielded to father. It was not until May 23rd, two or three days after A's initial seizure and eight days after A's "fall," that father called an ambulance when A suffered another seizure.

After A's hospitalization, a team of health care providers conducted a child abuse evaluation due to his injuries,

which included skull trauma, brain bleeding, a leg fracture, and retinal hemorrhaging. The team concluded that A's injuries were consistent with child physical abuse. In addition, it determined that his parents' delay in seeking medical attention was consistent with medical neglect. Finally, the team expressed concern that A was also suffering from nutritional neglect, given his poor weight gain since birth. At four months old, A still looked like a newborn. The team concluded that "[A]'s physical, medical, nutritional, and emotional health are at significant risk of further harm in his parents' care at this time." ODHS became involved and, at the end of May 2022, A was discharged from the hospital into the care of his resource parents. He remained under his resource parents' care during the time leading up to the termination trial, which took place in June 2025.

The juvenile court asserted dependency jurisdiction over A in April 2023 and later changed A's permanency plan from reunification to adoption. *See Dept. of Human Services v. K. R. K.*, 336 Or App 843, 561 P3d 1153 (2024), *rev den*, 373 Or 712 (2025) (affirming the change to A's permanency plan from reunification to adoption). In late 2023, father entered a plea deal for criminal charges related to his involvement in A's injuries and later received a 28-month prison sentence. At the time of the termination trial, father had about a month remaining before his expected release from incarceration.

D. *Mother's Circumstances*

In April 2023, mother participated in a neuropsychological evaluation with Dr. Sacks, a licensed clinical psychologist. Sacks concluded that although mother does not qualify for an intellectual disability, she struggles with skills such as "motor processing speed, arithmetic skill, auditory attention, fund of information, and some aspects of visual-spatial skill." Sacks opined that mother's "cognitive difficulties contributed to the problems that brought ODHS into her life" and expressed concern with mother's continued romantic relationship with father. He concluded that mother was not a safe parenting resource at the time of the evaluation, and he recommended that ODHS provide multimodal instruction to accommodate mother's cognitive

limitations and that mother participate in parenting training for non-perpetrators of child abuse.

Since A's removal, mother has tried to improve her parenting skills. She participated in four parenting classes that ODHS referred her to. She was engaged but sometimes struggled to retain the information from class to class. ODHS did not refer mother to a class for non-offending parents of child abuse, although Sacks conceded at trial that his recommendation was "awfully specific" and that there might not be formal training available in that area. ODHS also paired her with a parent mentor to help her learn the skills necessary to safely parent A. At trial, the ODHS caseworker, who has closely worked with mother since August 2022, testified that mother's cognitive difficulties continue to "appear to affect her ability to parent."

Mother has visited A regularly since his removal. Caseworker testimony reflected that A is always "really excited" to see mother during visits and calls her "mama." Mother has consistently requested shared visits with father, who attends virtually from prison. Her visits remain supervised due to safety concerns, and most visits occur within the controlled environment of the ODHS office. Mother is often distracted and unattuned to A's cues and abilities, and, by her own admission, tends to defer to others when it comes to parenting A. During one visit, a bystander intervened to save a choking A while mother calmly watched him. For another visit, mother's parent mentor had to dissuade mother from taking A to a bouncy house, which, given A's age and prior head trauma, put A at risk of serious physical harm.

Mother continues to struggle to comprehend A's needs and abilities, and her presence at his numerous medical appointments sometimes diverts medical providers' attention away from A. For example, A's physical therapist had to take time to re-explain A's overall needs and abilities to mother rather than provide instruction on how to administer at-home exercises that are critical to A's progress. Another time, A's occupational therapist had to repeatedly ask mother to not distract A during an evaluation because mother was interfering with the testing process. Mother

also indicated at trial that she does "[n]ot really" think it is important for A to work with doctors and therapists familiar with his complex medical history, and that, if she regained custody of A, she would seek out new specialists that are more conveniently located to her.

Mother has moreover continued to resist the abundant evidence, including that reflected in father's criminal conviction, that A's injuries and current presentation directly resulted from father's intentional abuse. Though mother has, at times, appeared to acknowledge father's role in A's injuries, she continues to vacillate between acceptance and doubt. Notably, the juvenile court found that mother was not "credible in her testimony that she believes [father] was the perpetuator of physical abuse against [A]" and is instead "suggestible" and "easily [] manipulated." Mother stayed in a romantic relationship with father until at least early 2024 and has maintained regular contact with him after their break-up. And despite obtaining a housing voucher and living in her own apartment for a brief spell, mother indicated at trial that she had moved back into father's former apartment and planned to give up her voucher.

At trial, mother also testified about her plan for A's paternal grandmother to move into her one-bedroom apartment. Apparently unaware that grandmother had recently been charged for driving under the influence of intoxicants and had a warrant out for her arrest, mother suggested that grandmother could drop A off at daycare if she regained custody of A. Mother rescinded her plan after being confronted with grandmother's criminal history later in the trial.

Mother has consistently maintained employment and housing throughout this case.

E.  *A's Circumstances*

A was three years old at the time of the termination trial. He bears the life-long consequences of physical abuse from his father and medical neglect that he suffered while in his parents' care. A has global developmental delay and is largely nonverbal. He is routine-oriented, especially vulnerable to attachment disruption, and at increased risk for seizures. He has chronic ear infections and an esophagus

and acid reflux issue. He wears a leg brace, which must be adjusted as he grows, and takes medications daily. After his removal, he underwent craniotomy surgery after his pediatric neurosurgeon identified further bleeding from his initial skull injury during a routine follow-up appointment. To address his extensive needs, A has an established and comprehensive network of about 10 medical specialists that he regularly works with, including a speech therapist and an occupational therapist. Due to his vulnerable and non-verbal condition, his medical providers heavily rely on his primary caregiver to understand A's complex needs, administer at-home therapies, and closely monitor and report any changes to his condition.

In October 2023, ODHS referred A for a "best interest" evaluation with a licensed child psychologist to gain a better understanding of A's caregiver and permanency needs. After reviewing the case history and medical records, interviewing the ODHS caseworker and A's resource mother, and conducting developmental testing on A, the psychologist concluded that A requires a stable caregiver who can care for his high needs, advocate for him within health systems, and protect him from further abuse and neglect. Further, the report stated that A has a "very high need" for permanency and that "[r]emaining in resource care indefinitely" increases A's risk of adverse developmental outcomes.

At the time of trial, A had been under the care of his resource parents for 36 of the 40 months of his life, and they wish to adopt him. A's primary attachment is with his resource mother, whom he also calls "mama." A's medical providers have credited A's significant therapeutic and developmental progress over those three years to his resource parents' excellent care. Among other things, A's resource mother has competently tracked and attended his numerous medical appointments, advocated for him to receive a diagnosis and treatment for an esophagus issue, administered his daily medications and at-home therapies, monitored him for seizures, addressed his chronic ear infections, ensured that his leg brace fits comfortably as he continues to grow, and offered him a sense of routine and nurturing through daily "snuggle time." A's resource mother testified that after

A's visits with mother, he generally is "clingier" and needs more "snuggle time" compared to his normal routine.

F.  *Termination of Parental Rights Trial*

In June 2025, the juvenile court held the termination of parental rights trial. Along with other evidence, ODHS introduced testimony from mother, Sacks, A's medical providers, and numerous social service workers who have worked with mother and A as to the above facts pertinent to the fitness and integration inquiries.

On the issue of best interests, the juvenile court, noting that it "need[ed] to know a few things in making [its] decision" on termination, asked the ODHS caseworker to explain the agency's decision to recommend adoption for A. That exchange went as follows:

"[Court:]    [T]here's several permanency plans. Talk to me about the decision for [ODHS] to ask for adoption.

"[ODHS caseworker:]   Yes. So when we make decisions about what permanency plan we recommend, we have * * * an [internal] staffing[.] * * * [W]e discuss, in those staffings, sort of the merits of adoption versus a guardianship. And in this case, given that [A] has essentially been in the same placement all of his life and his high medical needs, it was decided that adoption is in his best interest * * *.

"[Court:]   Okay. That is the only question I will ask because I'm a neutral third party, and I want it to stay that way. But I need to know the answer to this question; right? And so I will leave it up to the attorneys now to expand on that response * * *.

"* * * * *

"[Court:]    [Y]ou all have been practicing in this area a long time. You understand what I'm trying to get at."

The attorneys then elicited further testimony from the ODHS caseworker on ODHS's preference for adoption in lieu of guardianship for A. The ODHS caseworker testified that when "significant physical abuse" of a child catalyzes ODHS intervention, that fact weighs in favor of adoption. In addition, the ODHS caseworker indicated that adoption offers greater permanency than guardianship, due to the

risks of ongoing court involvement and "disrupted guardianships," and that adoption can offer "extra * * * psychological permanency" to a child because they "actually belong" to their adoptive parents. When mother's attorney inquired whether ODHS was concerned that guardianship "would be threatened in this particular case," the ODHS caseworker responded that such fears did not influence the agency's decision to recommend adoption. The ODHS caseworker also testified that, although conversations on the matter had not been extensive, mother had expressed a "preference for a guardianship over an adoption" if reunification failed.

Relatedly, A's resource mother offered testimony that she and her husband would adopt A if mother's parental rights are terminated, and that she does not think guardianship would be an "appropriate plan" for A because "there needs to be very clear boundaries set, and just that permanency for [A], so we can move forward as a family."

After the trial, the juvenile court found that ODHS had established, by clear and convincing evidence, that mother is unfit by reason of mother's conduct or condition that is seriously detrimental to A and that A's integration into her home within a reasonable time is improbable. ORS 419B.504. The court then determined that, based on the evidence presented, terminating mother's parental rights and allowing for A's adoption is in his best interests. ORS 419B.500. Mother now appeals.

## II.  ANALYSIS

"To terminate a parent's rights on the basis of unfitness, a court must find, by clear and convincing evidence, that (1) the parent is 'unfit by reason of conduct or condition seriously detrimental to the child or ward'; (2) 'integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change'; and (3) termination is in the child's best interest." *Dept. of Human Services v. N. H.*, 322 Or App 507, 513-14, 520 P3d 424, *rev den*, 370 Or 694 (2022) (quoting ORS 419B.504; ORS 419B.500). As we explain below, our *de novo* review confirms that clear and convincing evidence supports findings of mother's unfitness and the

improbability of her integrating A into her home within a reasonable time. However, we conclude that ODHS failed to prove, by clear and convincing evidence, that termination of mother's parental rights serves A's best interests.

A.  *Fitness*

A court measures a parent's fitness at the time of the termination trial and focuses on "the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *State ex rel SOSCF v. Stillman*, 333 Or 135, 146, 148, 36 P3d 490 (2001). The fitness inquiry is "child-specific" and "calls for testimony in psychological and developmental terms regarding the particular child's requirements," *N. H.*, 322 Or App at 514 (internal quotation marks omitted), given that "minimally adequate parenting skills may be different for a severely disabled child from those for a child that has no disabilities," *State ex rel SOSCF v. Wilcox*, 162 Or App 567, 576, 986 P2d 1172 (1999).

Here, clear and convincing evidence demonstrates that mother is unfit because her cognitive difficulties expose A, a child with heightened medical needs due to mother's failure to protect him from physical abuse and her failure to obtain necessary medical care after that abuse, to risk of further "*seriously* detrimental harm." *Dept. of Human Services v. J. E. D. V.*, 326 Or App 149, 166, 531 P3d 683 (2023) (emphasis in original). Specifically, mother's cognitive difficulties impede her ability to (1) adequately address A's high medical needs and (2) discern who is safe to be around A.

1.  *Mother is unable to adequately understand and address A's significant medical needs.*

The record demonstrates that mother is unable to understand and address A's significant medical needs. In fact, mother could not even meet A's *basic* needs prior to his removal. For one, he experienced feeding neglect and was severely underweight. And when father told mother that he had "dropped" A, mother failed to seek medical attention for A's obvious and severe injuries for eight days; in fact, it was father who ultimately sought medical advice and called an ambulance after A suffered multiple seizures.

Further, the record makes clear that, despite multiple interventions provided by ODHS, mother remains incapable of attending to A's now-heightened needs. Since mother lost custody of A, ODHS has provided mother robust parenting support and multimodal instruction to help mother address her parenting deficiencies. She has participated in several parenting classes, worked with a parent mentor, regularly visited A under supervision, and attended many of A's medical appointments.

Nevertheless, mother has not developed the skills necessary to safely parent A. Based on her own testimony and the testimony of others, mother is distracted to an unsafe degree while she is parenting A, often defers to others when caring for A, and does not evince awareness of A's complex diagnoses and needs. For example, the ODHS caseworker testified that because mother "needs more repetition and can be a slower learner," by the time mother acquires a new parenting skill, A is often "onto a new milestone." The ODHS caseworker added that mother is always "trying to play catch up to get to where [A] is in the moment" and struggles to "consistently meet [A's] needs, especially as they develop as he gets older." *See N. H.*, 322 Or App at 517 (concluding that mother's "cognition limitations, reflected in her inability to gain insights into child's developmental level * * * [was] detrimental to [child]'s development and future progress"). In addition, she struggles to attend and timely arrive to A's medical appointments, and too many delayed or missed appointments could result in A losing critical access to established medical providers. Even when mother does attend his appointments, her behavior has repeatedly deprived A of important medical attention and threatened his continued development. Moreover, mother's inability to recognize and respond to A's needs during supervised visits such that visit supervisors regularly intervened to protect A, including a time that A was choking, further persuades us that mother cannot provide minimally adequate care to A.

2. *Mother is unable to determine who is safe to interact with A.*

The record also contains substantial evidence that mother is unable to identify whether people are safe to be

around A. Sacks specifically advised ODHS to "[m]onitor her ability to judge the safety of those around her child," since her ability to do so "seemed limited" at the time of her 2023 neuropsychological evaluation. And at trial, the ODHS caseworker testified that mother continues to "struggle[] to identify who is safe and who isn't safe" to be around A, and that, even if she "recognizes that somebody might not be safe, she seems to struggle to assert boundaries with those individuals" in a manner that protects A from harm. By mother's own admission at trial, her delayed processing does not "keep[] [A] safe."

Mother's inability to identify who is safe to be around A is best exemplified by her interactions with father and with A's paternal grandmother. For example, before A's removal from mother's custody, she continued leaving A in father's care unattended despite clear warning signs that it was unsafe to do so. That decision exposed A to severe physical abuse from father and left A with lifelong medical complications. In addition, despite the efforts of multiple medical providers, caseworkers, and family members over several years to persuade her otherwise, mother still appeared to question whether father intentionally harmed A at trial. She offered conflicting testimony on the matter, and we give "considerable weight" to the juvenile court's determination that mother is not credible in her testimony that she believes father abused A. *See Wilcox*, 162 Or App at 573 (explaining that on *de novo* review, we give "considerable weight" to the trial judge's credibility findings). She has furthermore maintained an enmeshed, even if not always romantic, relationship with father throughout this case. Given father's expected release from prison in the month following trial, mother's failure to accept father's role in A's injuries and to more fully separate herself from father demonstrate that mother cannot adequately protect A from future abuse at the hands of father.

In addition, mother's plan for A's paternal grandmother, who had been recently charged for driving under the influence of intoxicants, to transport A to daycare shows that mother's inability to identify potential safety threats to A extends beyond father. Mother's apparent willingness to

entrust A's care to someone without adequately determining the potential safety threats that person may pose to her child puts A at risk of seriously detrimental harm.

In sum, ODHS produced clear and convincing evidence that mother's cognitive condition presents a barrier to her safely parenting A, particularly as related to her inability to adequately care for A's high medical needs and her inability to detect who is safe to be around A, which are seriously detrimental to A. *See N. H.*, 322 Or App at 518 ("Framed slightly differently, mother's *conduct*—reflected in mother's testimony at trial and her performance during visits and parenting classes—continues to be seriously detrimental to [child], and thus establishes her parental unfitness." (Emphasis added.)).

B.    *Integration of child into mother's home is unlikely within a reasonable time.*

Because we conclude that mother is unfit, we must next examine whether it is improbable that A can be integrated into her home within a reasonable time due to her particular condition and conduct not likely to change. *Id.*; ORS 419B.504. What constitutes a "reasonable time" is case-specific and depends on a child's unique "emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(26). To help evaluate whether a parent's conditions or conduct is likely to change within a time reasonable for the child, a court may look at the nature of the parent's conditions or conduct, the time passed between the child's removal and the termination trial, and the parent's progress in relation to the time elapsed and the remedial services provided. *See* ORS 419B.504(1)(d) (requiring courts to consider, among other things, any "failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected"); *see, e.g.*, *N. H.*, 322 Or App at 518-19 (concluding that integration was improbable within a reasonable time when an intellectually disabled mother could not adequately care for child's high needs after four years of parenting assistance and classes); *Dept. of Human Services v. W. L. J.-E.*, 324 Or App 121, 124,

524 P3d 989 (2023) (determining that father's conditions were unlikely to change due to the "intractable nature" of his personality disorder and his "failure to make meaningful progress"). Although a parent need not guarantee a child's "maximum emotional development" to prevent termination of their parental rights, *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 87, 106 P3d 627 (2005), the evidence here demonstrates that mother is unlikely to become even a "minimally adequate parent" within a time reasonable for A, *State ex rel SOSCF v. Lehtonen*, 172 Or App 584, 594, 20 P3d 210, *rev den*, 333 Or 73 (2001).

Specifically, given mother's modest progress over the three years between A's removal and the termination trial in combination with A's heightened developmental and permanency needs, we are convinced that her detrimental condition and conduct are not remediable within a reasonable time for A. As the juvenile court noted, this case has been "ongoing for longer than typical" to accommodate mother's cognitive limitations and provide her with the "maximum opportunity" to address the basis for A's removal. But our prior discussion about mother's unfitness makes clear that serious concerns about her ability to safely parent A persist despite the years elapsed and the numerous parental interventions provided by ODHS since A's removal. In addition, the record establishes that, as a child with global developmental delay, A has an urgent need for permanency and a stable caregiving attachment to foster his continued developmental progress. Therefore, granting mother any more time beyond the three years already afforded to her to buttress her limited parenting skills is unreasonable for A.

Moreover, we are not persuaded by mother's argument that ODHS's provision of Sacks's recommended training for non-perpetrators of physical abuse would make it likely that A could be integrated into her home within a reasonable time. Mother speculates that the training would "remed[y]" any lingering concerns about her fitness, because "it can be hoped" that the training would enable her to achieve "a better understanding of the dangers that father poses, the dishonesty and manipulation he has practiced, and that she needs to completely sever any relationship with

him." But this is not a case where ODHS withheld a specific service that would address the "sole barrier" to mother's ability to timely integrate her child into her home. *Cf. State ex rel Dept. of Human Services v. Keeton*, 205 Or App 570, 582-83, 586, 135 P3d 378 (2006) (determining that the state failed to prove integration was improbable within a reasonable time where the "sole barrier" to integration was mother's condition as an "untreated sex offender" and ODHS failed to timely refer mother to a sex offender treatment program). Given mother's resistance to internalizing father's role in A's prior injuries and current presentation over three years, it is unreasonable to assume that the provision of a single educational opportunity is likely to alter mother's perspective and behavior. *See K. T.*, 334 Or App at 62-63 (rejecting mother's challenge to her integration determination based on ODHS's failure to include mother in child's at-home therapies because, "[g]iven mother's history and minimal progress in other services," doing so "would not have appreciably improved mother's ability to integrate child into her home within a reasonable time"). Further, even if the training did inspire the desired change in mother's relationship with father, that would not ameliorate her inability to adequately address A's high medical needs, which represents a separate basis for her unfitness that also makes integration within a reasonable time unlikely.[1]

C.  *ODHS did not establish that termination of mother's parental rights serves child's best interests.*

Upon concluding that a parent is unfit and that integration is unlikely under ORS 419B.504, a court may terminate parental rights only if it also determines that termination is in the child's "best interests" given the child's unique needs. ORS 419.500; *N. H.*, 322 Or App at 519. Although our case law has not always made it clear, the best-interests

_____

[1] Relatedly, mother assigns error to the juvenile court's finding that ODHS "followed all of Dr. Sacks' recommendations stemming from his [2023] psychological evaluation" of mother, which included that mother "undergo educational efforts for non-perpetrators of child abuse." But even assuming that the court erred in making that particular finding, that error does not preclude us from independently determining that mother is unfit and that integration is improbable on *de novo* review, under which we "decid[e] for ourselves" whether termination is appropriate based on the evidence developed below. *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 52, 515 P3d 927 (2022).

determination involves a separate inquiry from that of the fitness and integration ones. Put another way, at this point in our analysis we have already determined that a child cannot return to a parent's custody and care; therefore, a best-interests determination does not turn on which among a parent and an identified adoptive resource, if any, is the "best" for the child. Instead, a best-interests analysis asks whether the child's best interests require severing the legal relationship between the parent and the child. The decision to sever a legal relationship is not one to be taken lightly, and, as we have made clear, ODHS bears the burden to demonstrate that it is highly probable that taking that irrevocable step is in the child's best interests.

We have previously identified several considerations that inform that analysis: "(1) the strength of the bond between the parent and child; (2) whether severing that bond will help or harm the child; (3) the benefits to the child of terminating parental rights; and (4) the risk of harm to the child posed by termination." *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 53, 515 P3d 927 (2022). As with most factor tests, the weight we give to each factor depends on the evidence presented and the particular situation of each child.

The Supreme Court has identified another potential factor in the best-interests inquiry: the viability of alternative paths to permanency. *See Dept. of Human Services v. T. M. D.*, 365 Or 143, 162, 442 P3d 1100 (2019) (noting that in some cases, "the availability of another permanency plan that will advance the child's best interest, such as a permanent guardianship, may be a factor in a court's decision"). To be sure, any identified adoptive placement is also relevant to the best-interests inquiry. *Dept. of Human Services v. M. H.*, 306 Or App 150, 161, 473 P3d 1152 (2020). However, determining whether termination serves a child's best interests demands "more than an assessment of the relative merits of their potential adoptive placement and returning them to live with their parents," as adoption is not the only permanent option available to children of unfit parents. *Dept. of Human Services v. J. A. P.*, 317 Or App 525, 526, 505 P3d 473 (2022). Rather, because we attach "significant weight to the

importance of preserving a child's relationship with [their] biological parent where that is possible to do consistent with [the child's] best interests," *Dept. of Human Services v. D. F. R. M.*, 313 Or App 740, 746, 497 P3d 802, *rev den*, 368 Or 702 (2021), we consider all options for preserving "whatever relationship is possible" between a child and their unfit parent, such as permanent guardianship, *J. A. P.*, 317 Or App at 526-27.[2]

Based on the record before us, we conclude that ODHS did not meet its burden to show, by clear and convincing evidence, that termination is in A's best interests.

Here, the bond between A and mother is what one would expect between a three-year-old child and an adult that they see on a routine basis in structured and therapeutic settings. A responds positively to mother during her regular visits and calls her "mama." Although A is not primarily attached to mother, given his age, developmental delays, and the fact that he has spent most of his life under his resource parents' care, the lack of a more traditional interpersonal bond between parent and child does not demonstrate that severing the *legal* relationship between the two is in A's best interests. After all, the legal relationship between A and mother is more than just how well they get along, or how much A's behavior demonstrates a connection to mother. Moreover, mother will be A's biological parent during his entire life, and his need

for connection with his biological parent presumably will shift over time, even if she is not functioning as his primary attachment. Consideration of a child's best interests involves recognition that the legal relationship functions

---

[2] A court may grant a petition for permanent guardianship on identical grounds as those for termination of parental rights. ORS 419B.365(2). However, instead of finding that severing the parent-child legal relationship serves the child's best interest, ORS 419B.500(1), in the case of permanent guardianship, the court but must instead find that it is in the child's best interests that the "parent never have physical custody of the [child], but that *other parental rights and duties should not be terminated*," ORS 419B.365(4)(b) (emphasis added). Nevertheless, permanent guardianship entails a "significant curtailment" of parental rights. *State ex rel Juv. Dept. v. Burke*, 170 Or App 644, 649, 14 P3d 73 (2000), *rev den*, 331 Or 583 (2001). Importantly, while a parent may move to review or modify a guardianship order, they may not move a court to vacate an established permanent guardianship. ORS 419B.368(1), (7).

to facilitate options for nurturing "whatever relationship is possible" with the biological parent; severing that legal bond will decrease the likelihood that the child's needs for connection will be accommodated.

And notably, the record does not demonstrate that A's emotional relationship with mother actively and appreciably harms him. *Cf. N. H.*, 322 Or App at 520-21 (concluding that a developmentally delayed child did not have an "interest in maintaining her legal relationship with mother" where child was not attached to mother and mother's irregular visits were doing "a lot of damage" to child). Although severe physical abuse precipitated A's removal from mother's care, mother was not the perpetuator of that abuse, and there is no indication that A suffers emotional trauma around mother. Indeed, the record shows that he is happy to see her during visits. *Cf. T. M. D.*, 365 Or at 162 (stating that "if a parent has physically abused a child and the child continues to suffer trauma in the parent's presence, those facts alone may establish that it is in the child's best interest to terminate parental rights"). To be sure, A needs some additional comfort after visits, as reflected in his need for prolonged "snuggle time" with his resource mother. However, that emotional need does not demonstrate that A's relationship with mother is harmful to him to such a degree that it weighs in favor of termination. On balance, the positive albeit limited bond between mother and A does little to assist in our determination as to whether terminating mother's legal rights is in A's best interests. *See id.* (explaining that the mere "absence of evidence that termination will cause potential harm" to a child is insufficient to satisfy ODHS's evidentiary burden).

What does assist us, and ultimately leads to our reversal, is that ODHS did not develop evidence permitting us to "determine with confidence that the benefits to the child of ending the child's legal relationship with a parent outweigh the risk of harm posed to the child by severing that legal relationship." *L. M. B.*, 321 Or App at 53.

Specifically, ODHS did not establish that, given A's particular situation, terminating his legal relationship with mother

would protect his best interests in ways that would otherwise be unavailable in the context of guardianship.

ORS 419B.500 does not require ODHS to "disprove the suitability of a permanency plan other than adoption in every [termination] case." *T. M. D.*, 365 Or at 162-63. But where a parent argues that a child's best interests can be satisfied absent termination and adoption, as is the case here, it is appropriate for a court to consider the viability of other permanency plans. *Id.* And despite being prompted by the juvenile court, ODHS did not present specific evidence as to why terminating mother's parental rights is superior to guardianship, an alternative arrangement for meeting A's high permanency needs that maintains his legal relationship with mother.

Importantly, the record lacks evidence as to whether A's resource parents, with whom A is securely attached to and who have provided A with exceptional care over three years, are amenable to acting as A's guardians if A's legal relationship with mother is preserved. It is certainly in A's best interests to remain under his resource parents' care; as a young child with global development delay, A demands a stable caregiving relationship to foster his continued healthy development. But the record does not establish whether termination is necessary to continue A's placement with his resource parents.

Further, there is no evidence that mother would interfere in the context of a permanent guardianship. In fact, when mother's attorney asked whether guardianship "would be threatened in this particular case," the ODHS caseworker testified that concerns around parental interference or other threats to guardianship *did not* inform ODHS's decision to favor adoption. *Cf. K. T.*, 334 Or App at 64-65 (determining termination served child's best interests where mother's volatile behavior would be "potentially disruptive" to a guardianship); *Dept. of Human Services v. T. M. M.*, 327 Or App 631, 638, 535 P3d 800 (2023) (affirming termination was in child's best interests where mother's history of instability and extreme behavior raised concerns that she "would try to interfere" with a guardianship). Moreover, the ODHS caseworker testified that mother had expressed

a preference for guardianship over adoption, which demon-strates mother's openness, at least to some degree, toward a guardianship arrangement even if mother's ideal outcome is reunification. Therefore, the record contains no indica-tion that termination and adoption are necessary to shield A from destabilizing parental interference in the case of guardianship.

Relatedly, many of ODHS's concerns about mother's harmful impact on A reflected throughout the record are not relevant in the context of guardianship and therefore do not establish that termination would best protect A's inter-ests. Those concerns include mother's tendency to distract attention away from A at his medical appointments, and, if awarded custody, her plan to replace A's established and extensive network of doctors. But again, we are not pre-sented with a "binary choice" between terminating mother's parental rights or returning A to his mother's care. *J. A. P.*, 317 Or App at 526. We have already decided that A will not return to mother's custody and care. In that context, we con-sider what rights a guardian has to address A's significant medical needs. A guardian granted legal custody of a ward has physical control of the ward, may authorize ordinary medical care and surgery for the ward, and may broadly make other decisions concerning the ward of "substantial legal significance." *See* ORS 419B.373 (describing the duties and authority of a legal custodian); ORS 419B.376 (describ-ing the duties and authority of a guardian). With those legal limitations on mother's ability to affect A's treatment and care, we cannot say that adoption, as opposed to guardian-ship, presents the only or optimal method of ameliorating the impacts of mother's detrimental behavior on A. Indeed, ODHS did not present any evidence to demonstrate that a guardianship would somehow fail to give A's guardian the legal tools to provide the necessary care for A.

Instead, the record contains the ODHS caseworker's testimony that adoption offers more permanency, including psychological permanency, than guardianship due to the latter arrangement's potential for ongoing court involve-ment, and A's resource mother's testimony that she does not believe guardianship is "appropriate" due to the need

to set "very clear boundaries" for A and to provide A with permanency.

Together, that testimony incorrectly advances the notion that adoption would offer greater permanency to A than guardianship, so it does not support a determination that termination is in A's best interests. Importantly, since 2019 the Supreme Court has rejected the view that adoption offers more permanency than guardianship. *T. M. D.*, 365 Or at 164-65; *see also Dept. of Human Services v. D. E. P.*, 315 Or App 566, 570, 502 P3d 764 (2021) (rejecting, in light of *T. M. D.*, ODHS's "oft-repeated argument * * * that adoption is the 'most permanent option'"). And we have explained that a child's need for psychological permanency does not evince a child's need for *legal* permanency by way of termination. *M. H.*, 306 Or App at 164. Indeed, we have stated that, "[a]s is the case with any legal matter, it is the responsibility of adults to communicate to child what he needs to know about the permanence of his legal relationships." *D. F. R. M.*, 313 Or App at 746.

In addition, the best-interests inquiry focuses on the child's needs, rather than a parent's or resource parent's interests or desires. *T. M. D.*, 365 Or at 166. And we cannot tell to what degree A's resource mother's testimony was influenced by ODHS's faulty framing on the relative merits of permanent guardianship as opposed to termination; as already discussed, Oregon courts consider permanent guardianships to be functionally as permanent as adoption by way of termination. *See J. A. P.*, 317 Or App at 527 (placing no weight on foster mother's testimony that did not "reflect an accurate understanding of a permanent guardianship and d[id] not inspire confidence that [O]DHS ha[d] conveyed accurate information regarding the merits and terms of a permanent guardianship").

In sum, ODHS did not develop evidence demonstrating that permanent guardianship cannot satisfy A's high permanency, caregiving, and developmental needs while maintaining his legal relationship with his biological mother. Whether such a case could have been made is not for us to say; on appeal, we have only the record that was developed below. Because ODHS failed to present evidence

on whether A would suffer any detriment in the context of guardianship that would be alleviated by adoption, we cannot conclude based on this record that it is highly probable that termination is in A's best interests.

Reversed.